UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Barbara Kuebler and Jeannette Jordan, <br><br> Plaintiffs, <br><br> v. <br><br> NuCare Services Corp., an Illinois Corporation, <br><br> Defendant. | Case No. 14-cv-05265 <br><br> Judge Joan B. Gottschall <br><br> Magistrate Judge Mary M. Rowland |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**PURSUANT TO LOCAL RULE 56.1**

Defendant NuCare Services Corp. ("NuCare" or the "Company"), by and through its attorneys, David G. Weldon, Sonya Rosenberg and Jason C. Kim of Neal of Gerber & Eisenberg LLP, pursuant to Local Rule 56.1, sets forth its statement of undisputed material facts on which it relies in support of its Motion for Summary Judgment, as follows:

**I.     THE PARTIES**

1.     Plaintiff Barbara Kuebler ("Kuebler") is an individual residing in Chicago, Illinois. Tab "A"- Deposition Transcript of Kuebler, hereinafter "Kuebler Tr.," 6:21-23, 7:18-19. Kuebler's date of birth is September 19, 1959. *Id.*, 7:18-19.

2.     Plaintiff Jeannette Jordan ("Jordan") is an individual residing in Glen Ellyn, Illinois. Tab "B" - Deposition Transcript of Jordan, hereinafter "Jordan Tr.," 6:8-9. Jordan's date of birth is October 25, 1954. *Id.*, 11:3.

3.     Defendant NuCare Services Corporation ("NuCare," or the "Company") is an Illinois corporation that provides consulting services to skilled nursing facilities. Tab "C" -

Deposition Transcript of Tim Fields, hereinafter "Fields Tr.," at 17:12-19, 41:17-42:3; 142:22-143:1.

4. As relevant here, NuCare employs "liaison" employees, who are responsible for providing marketing and placement assistance to skilled nursing facilities by referring and securing admissions of patients into these facilities from various area hospitals. *See id*.; *e.g.*, Tab A - Kuebler Tr., 63:23-64:16, 66.

5. Kuebler and Jordan were employed with NuCare as liaisons for approximately six (6) months, from about January 2013 through June 2013. Tab A- Kuebler Tr., 80:8-10, 141:7-14; Tab B- Jordan Tr., 83:4-13, 154:9-12.

## II. PLAINTIFFS' COMPLAINT ALLEGATIONS

6. Plaintiffs' two-count Complaint alleges Kuebler and Jordan were discriminated against on the basis of their age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. ("ADEA"), when their employment was terminated by NuCare. *See* Complaint. Count I of the Complaint alleges an ADEA age discrimination claim on behalf Plaintiff Kuebler; and Count II alleges a virtually identical ADEA age discrimination claim on behalf of Plaintiff Jordan. *Id*.

## III. TIM FIELDS HIRES KUEBLER AND JORDAN AT NUCARE

### A. Plaintiffs', Fields' and Liberson's Prior Employment at Lexington

7. Before they began their employment at NuCare, Kuebler and Jordan worked as liaisons for Lexington Health Care ("Lexington"). Tab A - Kuebler Tr., 62:4-11; Tab B- Jordan Tr., 17:6-20. While working together at Lexington, Kuebler and Jordan became friends. Tab A- Kuebler Tr., 62:20-63:1; Tab B - Jordan Tr., 17:6-7, 18:11-16.

8. Tim Fields also previously worked for Lexington, in the position of Vice President of Business Development. Tab C - Fields Tr., 9:8-15. While in that position, Fields hired Kuebler as a liaison at Lexington. Tab A - Kuebler Tr., 29:18-19; Tab C - Fields Tr., 9:8-22, 72:7-13.

9. In approximately 2011, Fields accepted a position with Symphony Financial ("Symphony") and Defendant NuCare. Tab C - Fields Tr., 8:9-9:7. Symphony and NuCare are sister companies that are part of the Symphony Post Acute Care Network. *Id*.

10. At all relevant times to this litigation, Fields' position with Symphony and NuCare has been the Senior Vice President of Strategy and Development. *Id*., 8:14-16. In this position, Fields is responsible for overseeing Symphony's and NuCare's marketing services, including through the hiring and termination of the liaison employees who help provide these services. Tab C -Fields Tr., 41:17-42:3.; *see* Tab "D" - Deposition Transcript of NuCare's Chief Executive Officer David Hartman, hereinafter "Hartman Tr.," 14:12-17, 15:23-16:2, 16:10-12; Tab "E" - Deposition Transcript of Lorin Liberson, hereinafter "Liberson Tr.," 37:24-38:6.

11. Lorin Liberson (maiden name Schubert), who, at all the relevant times to this litigation, was the Regional Vice President of Business Development and both Plaintiffs' direct supervisor at NuCare, incidentally also was previously employed at Lexington, in the position of Director of Business Development. Tab E -Liberson Tr., 9:17-20. Liberson met Kuebler while working at Lexington, and developed a positive impression of her. *Id*., 52:5-19.

**B.  Fields Hires Kuebler at Symphony, Later Transfers Her to Nucare**

12. In approximately early 2012, Fields called Kuebler and asked if she was interested in a liaison opening at Symphony. Tab A - Kuebler Tr., 19:12-20:6, 21:15-18.

Kuebler initially responded that she was not interested, but, when Fields called her again, agreed to come in for an interview. *Id.*, 19:7-1, 20:6-21:3.

13. Following Kuebler's interview, Fields decided to hire Kuebler and offered her the liaison position at Symphony. *Id.*, 22:1-20, 22:4-24, 23:1-5; Fields Tr., 201:19-202:16. Kuebler accepted Fields' offer, and began her employment as a liaison at Symphony on March 19, 2012. Tab A – Kuebler Tr., 21:4-7, 24:13-18, 26:20-27:1.

14. While she was working at Symphony, Kuebler had a "heated disagreement" with Amy Hammond, the assistant administrator at Symphony of Joliet, a skilled nursing facility to which Kuebler was responsible for referring patients. *Id.*, 32:22-33:2, 39:4-19.

15. At her deposition, Kuebler could recall only that this disagreement had something to do with a patient and that Hammond was "upset" about it. *Id.*, 39-44. Hammond recalls her disagreement with Kuebler to be more general in its nature; namely, Hammond was concerned that Kuebler often communicated in a curt, unprofessional manner with her and with Symphony of Joliet's administrator, Tammy Stoneberger. Tab "F" - Declaration of Amy Hammond, hereinafter "Hammond Dec.," ¶ 2.

16. In any event, both Kuebler and Hammond recall that their disagreement escalated during an in-person exchange, which Kuebler left in a huff to call Fields and her then direct supervisor, Regional Vice President Donna Field. Tab F- Hammond Dec., ¶ 3; *see* Tab A- Kuebler Tr., 39:20-41:5. Both Fields and Field then arrived at Symphony of Joliet, and met with Kuebler, Hammond and Stoneberger. Tab F- Hammond Dec., ¶ 3; Tab A- Kuebler Tr., 42:21-45:7, 46:10-11. During this meeting, Hammond and Stoneberger discussed their concerns about Kuebler's communication style and generally negative attitude, and requested that she make an improvement in this regard. Tab F - Hammond Dec., ¶ 3. After the meeting, Kuebler apologized

to Hammond and Stoneberger and tearfully told them she would improve in how she interacted with them. *Id.*; *see* Tab A Kuebler Tr., 45:2-11, 46:10-11.

17. Sometime after this meeting at Symphony of Joliet, Hammond received a complaint about Kuebler from Sharon Skita, a social worker at Presence, St. Joseph Hospital (formerly called Provena St. Joseph Hospital). Skita told Hammond that she and her fellow social worker, Sandy Knoblack, had observed Kuebler loudly crying in their hospital lounge. Tab F - Hammond Dec., ¶ 4. Hammond and Stoneberger discussed this complaint with Kuebler, who became upset and requested that the matter not be relayed on to Donna Field. *Id*. In addition, Stoneberger observed that Kuebler "was not around a lot" and often "was missing" and not available at the Symphony of Joliet facility. Tab G - Deposition Transcript of Vice President of Human Resources Carly Saltis, hereinafter "Saltis Tr.," 46:7-14, 55:4-16.

18. By approximately January 2013, Fields decided it would be best to transfer Kuebler from Symphony. Tab C - Fields Tr., 146:20-147:13. At this time, NuCare had an opening for a liaison position at the University of Illinois hospital ("UIC"), reporting to Liberson. *Id.*, 150:4-5. Fields informed Kuebler of the transfer, and it took effect, in approximately January 2013. Tab A - Kuebler Tr., 49:2-7, 10-21, 42:1-9. Liberson was excited that Kuebler was being added to her team, and looked forward to working with her again. Tab E - Liberson Tr., 50:13-52:4.

### C. Fields Hires Jordan at NuCare

19. In December 2012, Jordan decided to resign her position at Lexington. Tab B - Jordan Tr., 39:3-41. The reason for the decision, as Jordan explained in her deposition, was that she "thought [she] was getting written up" by her supervisor, who met with her about a patient

issue and told her she "needed to change" with respect to how she was communicating with Lexington's skilled nursing facility clients. *Id*.

20. Before Jordan resigned from Lexington, Fields had "sought [her] out" on Kuebler's recommendation, to see if Jordan may be interested in working for NuCare as a liaison focusing primarily on the Aria in Hillside ("Aria") skilled nursing facility. Tab B - Jordan Tr., 54:8-18, 58:20-61; Tab C- Fields Tr., 113:5-13, 207:16-208:2.

21. After meeting with Jordan and Aria's then administrator, Mo Polstein, Fields decided to hire Jordan and made a job offer to her. Tab B - Jordan Tr., 68:4-69:2, 82:10-83:3, Tab H -Jordan Ex. 5; Tab C - Fields Tr., 113:5-20. Jordan accepted Fields' offer, and began her employment with NuCare on or around December 26, 2012. Tab B-Jordan Tr., 83:5-85:1.

### III. KUEBLER'S AND JORDAN'S POOR WORK PERFORMANCE LEADS FIELDS TO MAKE THE DECISION TO TERMINATE THEIR EMPLOYMENT

22. As liaison employees at NuCare, Kuebler and Jordan were primarily responsible for assessing hospital patients for referral to skilled nursing facilities – in Jordan's case, primarily to Aria, and in Kuebler's case, to any skilled nursing facilities – with the ultimate goal of maximizing patient admissions into these facilities. Tab A - Kuebler Dep., 32:8-18, 36:6-20, 37:9-12, 63:23-64:16, 66; Tab B - Jordan Tr., 55:8-22; Tab D - Hartman Tr., 9:21-10:20; Tab C - Fields Tr., 29:19-30:5, 157:4-7; 218:8-14; Tab E - Liberson Tr., 16:19-23, 23:17-24:13; Tab G - Saltis Tr., 24:7-24, 28:17-2, 29:1-11, 35:10-21; Tab I - Defendant's Supplemental Answer to Interrogatory 1(a) of Plaintiff Barbara Kuebler's Second Set of Interrogatories, at p. 1.

23. An individual's ability to succeed in the liaison position depends on his/her business development and interpersonal skills, including the ability to build and maintain strong relationships with the referral sources at the assigned hospitals, and also the administrators and staff at NuCare's skilled nursing facility clients. Tab E - Liberson Tr., 24:8-13, 176:19-178:6.

24. At NuCare, an Employee Action Plan ("EAP") is an indicator of serious under-performance, and, in the case of liaisons – a position that, by its nature, tends to have a high turnover rate – the last opportunity an employee is given to improve prior to termination. Tab E-Liberson Tr., 29:3-23, 97:5-11; Tab G - Saltis Tr., 88:22-89:18. Tab C - Fields Tr., 83:12-84:4.

25. EAPs vary in length of time and in content. Tab J - Saltis Dec., ¶ 2; Fields Tr., 57:20-58:7, 62:5-24, 100:1-5. Depending on the progress, or the lack of progress, that an employee shows while on an EAP, an EAP may be extended, or cut short prior to a termination decision being made. Tab J - Saltis Dec., ¶ 2; *see* Tab G- Saltis Tr., 73:18-74:24; Tab E - Liberson Tr., 162:1-4.

26. Since 2013, NuCare has placed a number of liaison employees substantially younger than Kuebler and Jordan on EAPs. Tab G - Saltis Tr., 20, 21:1-19; *see* Tab J - Saltis Dec., ¶ 1. For example, Tina Robinson (date of birth: May 14, 1973), Jill Bajorek (date of birth: August 21, 1985), Ann Ribordy (date of birth: January 7, 1970) and Suzy Povrzenic (date of birth: March 14, 1981) have been placed on Employee Action Plans ("EAP"). Robinson, Bajorek and Ribordy completed their EAPs, and remain employed at NuCare. Tab G - Saltis Tr., 21:14-19; Tab J- Saltis Dec., ¶ 1; *see* Tab C -Fields Tr., 187:6-15; Tab E- Liberson Tr., 136:2-12; 149:24-150:8. Povrzenic showed improvement on her EAP, but then voluntarily resigned her employment. After being rehired by NuCare in approximately May 2015, Povrzenic again demonstrated unsatisfactory performance, which resulted in the termination of her employment on or around June 12, 2015. Tab J - Saltis Dec., ¶ 1.

    A. **Kuebler's Poor Work Performance and Termination**

27. After the first few months of Kuebler's employment at NuCare, Liberson became concerned that Kuebler's admissions numbers from UIC were low, including as compared to

historical admissions numbers from the same hospital, which previously had been assigned only a part-time liaison. Tab E -Liberson Tr. 53:1254:3, 55:6-13, 56:1-9, 57:23-58:9. Tab C - Fields Tr. 79:3-8. Accordingly, and based on some related shortcomings Liberson observed in Kuebler's ability to build relationships with referring sources, it was decided that Kuebler should be placed on an EAP. *See id.*; Liberson Tr., 30:10-14, 58:17-59:5; Fields Tr. 80:6-21,203:6-22; 204:10-205:2.

28. Liberson and Kuebler met to discuss and review her EAP in person, on or around April 26, 2013. Tab A: Kuebler Tr., 87:16-20, 88:5-20, 89:3-5, 91:9-17, *see* Tab K - Kuebler Ex. 8. During this meeting, Liberson provided Kuebler with a copy of the written EAP, and reviewed its contents with her in detail. *Id.*, 91:18-24, 92:1-11, 93:2-8, 95:17-23; Kuebler Ex. 9.

29. Among other things, during the April 26th EAP meeting Liberson reviewed with Kuebler that in February 2013 she secured ten (10) admissions from UIC, as compared to fifteen (15) admissions that were secured from UIC in February 2012. Tab A - Kuebler Tr., 96:16-18, 97:1-21; Tab K - Kuebler Ex. 9, at p. 2. Liberson also reviewed with Kuebler that she secured only six (6) admissions from UIC in March 2013, as compared with fourteen (14) admissions that were secured in March 2012. *Id.* Liberson and Fields expected that as an experienced liaison, Kuebler should demonstrate higher admissions numbers. *See* Tab E - Liberson Tr. 53:1254:3, 55:6-13, 56:1-9, 57:23-58:9. Tab C - Fields Tr. 79:3-8.

30. As for Kuebler's improvement goals, Kuebler's April 26th EAP required that in the next thirty (30) days she, among other things: secure fifteen (15) new admissions from UIC; provide weekly status updates to Liberson about the progress of her patient referrals; and create effective marketing opportunities with key referring social workers and medical doctors at UIC to help increase admissions from that hospital. Tab A -Kuebler Tr., 100:23-101:6, Tab K-

Kuebler Ex. 9; *see* Tab E - Liberson Tr., 61:5-11, 65-74, 76:10-77:9; Tab C - Fields Tr., 100:24-101:9.

31. Following the April 26th EAP meeting, Kuebler and Liberson had approximately weekly check-in conversations to discuss her progress on the EAP. Tab A - Kuebler Tr., 100:23-101:6; 113:21-114:1; Tab E - Liberson Tr., 55:6-13. In addition, every Wednesday Kuebler was required to e-mail Liberson a completed Liaison Accountability Tracking From (the "Tracking Form"), to report on the status of her pending referrals and admissions, any marketing events she had participated in, and any related notes or considerations she wished to share from the prior week. Tab A - Kuebler Tr., 105:22-107:10, 126:15-127:21, Tab K -Kuebler Exs. 14, 20-22; Tab E - Liberson Tr., 101:6-19.

32. As of the end of the first week of her EAP, Kuebler had secured zero admissions. Tab E - Liberson Tr., 95:13-96:10; see Tab A - Kuebler Tr., 103:22-104:4. On May 8, 2015, Kuebler submitted a Tracking Form reflecting only two (2) admissions. Tab A-Kuebler Tr., 107:24, 108:1-2, Tab K - Kuebler Ex. 14. On May 15, 2013, *i.e.*, more than halfway through her 30-day EAP, Kuebler sent Liberson a Tracking Form reflecting only two (2) admissions for the time period of May 8 to May 15, 2013. Tab A - Kuebler Tr., 112:8-24, 113:1-7, Tab K Kuebler Ex. 16.

33. On May 22, 2013, Kuebler sent Liberson an e-mail listing her "admissions" beginning from the beginning of the EAP, which reflected eleven (11) admissions total. Tab A - Kuebler Tr., 115:10-13, 116:22-24, Tab K - Kuebler Ex. 18. On closer look, however, it was determined that a number of Kuebler's supposed "admissions" actually were re-admissions of formerly admitted patients, and thus did not count toward her 30-day goal of fifteen (15) *new* admissions. Tab C - Fields Tr., 159:4-160:12, 160:20-161:5, Tab L - Fields Ex. 21; Tab E -

Liberson Tr., 169:15-22; *see* Tab A - Kuebler Tr., 115:1-16, 116:1-16, 117:1-21. In short, Kuebler did not meet the 15 new admissions goal set forth in her EAP. *See id.*; Tab C - Fields Tr., 94:4-10, 95:7-16.

34.  On June 5, 2013, Kuebler sent Liberson and Fields an e-mail enclosing a Tracking Form for May 30 to June 3, 2013, which reflected only two (2) admissions for that week, and stated "Disappointing week!!" in its body. Tab A - Kuebler Tr., 125:8-21, Tab K - Kuebler Ex. 20. Kuebler submitted her next Tracking Form a day late on June 13, 2013, and that Tracking Form reflected only two (2) additional admissions for the time period of June 6 to June 12, 2013. Tab A - Kuebler Tr., 126:14-127:10, 128:8-12; 129:2-19, Tab K - Kuebler Exs. 21 and 22. On June 19, 2013, Kuebler e-mailed Liberson a Tracking Form that reflected zero admissions for the week ending on June 19, 2013. Tab A - Kuebler Tr., 132:21-134, Tab K - Kuebler Ex. 25.

35.  By approximately June 2013, it became apparent to Fields that Kuebler had failed to improve her performance, and that, as a result, her employment should be terminated. Tab C- Fields Tr. 67:11-18, 102:16-103:4, 104:6-14, 107:21-108:3, 204:10-205:2, 206:17-23

36.  Fields discussed his decision to terminate Kuebler's employment with NuCare's Vice President of Human Resources and Employee Enrichment, Carly Saltis. *Id.*, 108:8-18; *see* Tab G - Saltis Tr., 7:10-13. Based on their schedules, Saltis and Fields agreed to have the termination meeting with Kuebler on June 20, 2013, at 9:00 a.m. Tab C - Fields Tr., 173:23-174:5; *see also* Tab A - Kuebler Tr., 130:19-24, 131:4-15. Early on June 20th, however, Kuebler notified Fields that her brother unexpectedly passed away and she could not make the meeting. Tab A - Kuebler Tr., 131: 8-24, 132, 1-2. Accordingly, Fields and Saltis rescheduled their meeting with Kuebler to June 26, 2013. Tab A - Kuebler Tr., 150:13-22; Tab G - Saltis Tr., 139:11-24.

37. On June 26, 2013, Fields and Saltis met with Kuebler to inform her of the decision to terminate her employment. Tab A - Kuebler Tr., 139:10-17, 141:7-14, 150:11-15. Although Kuebler does not recall whether Fields stated in the meeting that the termination decision was based on poor performance (*see id.*, 141:15-22), Fields testified he "remember[ed] that [he] told [Kuebler] that she had been on an action plan and was not meeting some of the performance metrics, and that we were going to terminate based on performance" (*see* Fields Tr., 109:8-14).

38. Neither at her termination meeting, nor at any time during her employment with NuCare, did Kuebler express any concerns or complaints to Fields, Saltis or any other Company manager that she believed she was singled out, mistreated or discriminated against, in any manner, based on her age. Tab A - Kuebler Tr., 148:2-10.

39. Moreover, Fields, who knew Kuebler from Lexington and had seen her in person numerous times – and, significantly, who made the decisions to both hire and terminate Kuebler at NuCare – did not know, or care about, Kuebler's age. Tab C - Fields Tr., 202:17-22, 206:17-207:12. Fields did not discuss or comment about Kuebler's age, in any manner, in any communications he had with Liberson, Saltis or anyone else at NuCare. *Id.*; Tab G -Saltis Tr., 133:21-134:1; Tab E - Liberson Tr., 200:9-201:2.

40. On July 3, 2013, Saltis sent Kuebler a letter confirming the termination of her employment, and the reasoning for the termination. Tab G - Saltis Tr., 113:7-8; Tab M - Saltis Ex. 14. Kuebler received and reviewed this letter. Tab A -Kuebler Tr., 140:11-24, 141, 142:1-2.

41. In August 2013, *i.e.*, just over one month following her termination from NuCare, Kuebler accepted a job offer for a liaison position at Franciscan Sisters of Chicago ("Franciscan"). Tab A - Kuebler Tr., 155:7-11. This liaison position is the same type of a

position as the liaison position Kuebler held at NuCare, and is compensated at the same salary of approximately $81,000, as Kuebler's ending salary at NuCare. *Id.*, 155:19-23, 156, 157:1-14. Kuebler is still employed as a liaison at Franciscan. *Id.*, 155:17-18.

### B. Jordan's Poor Work Performance and Termination

42. During her employment as a liaison at NuCare, Jordan primarily was assigned to Elmhurst, Gottlieb and Loyola hospitals. Tab B - Jordan Tr., 89:15-24, 108:1-4.

43. Less than two weeks after commencing her employment at NuCare, Jordan sent an e-mail to Colleen Casey, a case manager at Elmhurst Hospital. *Id.*, 90:7-21, 91:1-17, 93:7-12, Tab H - Jordan Ex. 7. With respect to her new position at NuCare, in this e-mail Jordan wrote that she "c[ould]n't stand" her job "being sooooo slow" and questioned whether she "made the right decision" in accepting the position with NuCare. *Id.*, 93:16-24, 94:1-11, Tab H - Jordan Ex. 7. In the same e-mail, Jordan also called the check-in person at Elmhurst "such a bitch," and stated that she (Jordan) was "so stressed." *Id.*, 94:11-24, 95:1-13, Jordan Ex., 7. Casey responded that Jordan should "give it time," and, as Jordan understood her, "try to get in front of the social workers' faces basically to push for NuCare." *Id.*, 96:7-18, Tab H - Jordan Ex. 8.

44. During the time of Jordan's employment with NuCare, Aria's Administrator Mo Polstein was concerned about improving referrals and admissions to Aria. Tab N - Declaration of Mo Polstein, hereinafter "Polstein Dec.," ¶¶ 1-2; *see* Tab B - Jordan Tr., 100:21-101:21, Tab H - Jordan Ex. 8.

45. Polstein regularly communicated the need to increase referrals and admissions into Aria with NuCare's management and liaisons, including Jordan. *See id.*, Tab N - Polstein Dec., ¶ 1. Liberson also repeatedly communicated to the liaisons, including Jordan, about the need to step up efforts at Aria, including by encouraging tours and selling the recently renovated

rooms in that facility. Tab B - Jordan Tr. 102, 103:1-20, Tab H - Jordan Ex. 9. Further, Polstein and Aria's admissions director, Marquisa Bennett, held monthly group meetings with NuCare liaisons, which Jordan regularly attended, to discuss the liaisons' performance in terms of their specific, individual referrals and admissions to Aria, as well as strategies for increasing these numbers. Tab N - Polstein Dec., ¶ 3; Tab B - Jordan Tr., 104:19-24, 105, 106:11:-17; *see* Tab E - Liberson Tr., 23:6-11; Tab C - Fields Tr., 34:23-35:11, 197:24-198:12.

46. Polstein was dissatisfied with Jordan's efforts on behalf of Aria. Tab N - Polstein Dec., ¶ 4; *see* Tab G- Saltis Tr., 40:10-24, 41:1-6; Tab C - Fields Tr., 117:8-118:7, 119:3-11. He observed repeatedly that Jordan was not a team player, was combative and negative in how she communicated Aria-related concerns, and generally failed to present and market Aria in a positive manner. *Id*.; *see also* Tab B - Jordan Dep., 126:4-16. During her deposition, Jordan testified that, in connection with a certain patient admission issue Polstein told her that she "should really try to stick up more for the [Aria] building." Tab B - Jordan Tr., 126:7-18. Indeed, Polstein repeatedly counseled Jordan to present Aria in a positive light to referring sources and potential patients, but she consistently failed to do so. Tab N - Polstein Dec., ¶ 5.

47. In addition, Liberson and Fields also observed that Jordan generally was not easy to work with, and generally displayed a defensive and combative demeanor. Tab E - Liberson Tr., 131:24-132:23; Tab C - Fields Tr., 116:8-117:7, 196:10-18, 208:21-209:3.

48. Based on these observations, Liberson and Fields agreed that Jordan needed to demonstrate an improvement in her performance. Tab E - Liberson Tr., 137:4-10. Accordingly, Jordan was placed on a 30-day EAP. *Id.*, 137:11-18; Tab C -Fields Tr., 120:22-121:23, 209:7-16.

49. On or around May 6, 2013, Liberson met with Jordan to provide her with the EAP document, and to review the components of the EAP with her. Tab B - Jordan Tr. 107, 108:8-11, 109:2-10, 123:1-6, Tab H - Jordan Ex. 10; Tab E - Liberson Tr., 139:19-21. As soon as Liberson explained this purpose behind the May 6th meeting, Jordan became defensive and asked if she was "getting fired." Tab B - Jordan Tr., 131:20-23; Tab E - Liberson Tr., 138:21-24, 139:1-4. Liberson responded that, no, the point of the meeting was to discuss Jordan's EAP and her goals for improvement. Tab B - Jordan Tr., 107, 108:8-11, 109:2-10, 123:1-6, Tab E - Liberson Tr., 138:21-139:1-12.

50. Liberson then reviewed the 30-day improvement goals she prepared for Jordan, including that she was expected to: secure 17 admissions from her assigned hospitals; provide weekly progress updates to Liberson regarding the status of her efforts, and build and strengthen marketing relationships by scheduling continuing education classes for hospital social workers and case managers and through creative marketing strategies; and to schedule meetings with key referring social workers, case managers and doctors. Tab B - Jordan Tr., 110-114:1-2, 116:20-23, 117:13-21, 131:9-19, Tab H - Jordan Ex. 10.

51. In the same (May 6th) meeting, Liberson emphasized to Jordan the importance that she "work on being part of the NuCare team." Tab B - Jordan Tr., 117:13-21, 121:11-122:1. As Jordan understood it, this particular goal was connected to a prior patient issue she had, where she "exchange[d] []  words" with, and later apologized to, NuCare's Director of Nursing. *Id*., 117:13-120, Tab H - Jordan Ex. 10. Liberson also addressed with Jordan the importance of timely submitting new admission paperwork to the skilled nursing facility, and being communicative in that regard with the facility's staff. *Id.*, 121:11-24, 122:1-17.

52. Liberson observed that throughout the May 6th EAP meeting, Jordan displayed a "hostile and defensive" demeanor. Tab E - Liberson Tr., 138:21-139:4.

53. Liberson and Fields observed that Jordan failed to improve her performance after being placed on her EAP. Tab C - Fields Tr., 125:13-21, 126:10-127:1, 209:7-22. Her admissions numbers were still low (*see id.*), and Polstein did not see improvement in how Jordan marketed or communicated about or within Aria (Polstein Dec., ¶ 6). On or around June 11, 2013, Jordan and Liberson met to discuss her performance. Tab B - Jordan Tr., 139:8-15. In this meeting, Liberson discussed with Jordan the need to continue improving admissions numbers at Aria, asked her to increase her efforts with respect to admissions from Elmhurst Hospital, and also told her she needed to work on a targeted referring physician list. Tab B - Jordan Tr., 139:16-141:10.

54. Based on Jordan's continuing poor performance, in approximately June 2013 Fields made the decision to terminate her employment. Tab C - Fields Tr., 66:23-67:10, 133:8-14, 209:8-210:5. Fields communicated this decision to Saltis and, based on their schedules, they agreed to meet with Jordan on June 26, 2013. Tab B - Jordan Tr., 154:4-11; *see* Tab C - Fields Tr., 134:19-21.

55. Jordan testified that at the June 26, 2013 termination meeting, Fields told her that her employment was being terminated because "things [were] just not working out with [her] working as a liaison for Aria, and [Fields] thought [NuCare] would have better [referrals and admissions] numbers from [her] working there." Tab B - Jordan Tr., 157:6-24. Jordan also testified that Fields told her she was not a team player with Aria's staff. *Id.*, 158:1-20; *see* Tab G - Saltis Tr., 99:24, 100:1-5; Tab C - Fields Tr., 134:22-135:9.

56. Neither at her termination meeting, nor at any other time during her employment with NuCare, did Jordan express any concerns or complaints to Fields, Saltis or any other Company manager that she believed she was singled out, mistreated or discriminated against, in any manner, based on her age. Tab B - Jordan Tr., 159:19-24, 160:1-22.

57. Fields, who saw Jordan in person numerous times – and who, significantly, was responsible for hiring Jordan and for making the decision to terminate her employment approximately six (6) months later – did not know, and did not care about, Jordan's age. Tab C - Fields Tr., 210:6-17. Fields did not ever discuss or comment on Jordan's age, in any manner, in any communications he had with Liberson, Saltis or anyone else at NuCare. *Id*.: Tab G - Saltis Tr., 133:16-20; Tab E - Liberson Tr., 200:9-201:2.

58. On July 3, 2013, Saltis sent Jordan a letter confirming the termination of her employment and the reasoning behind the termination. Tab B - Jordan Tr., 161:5-24; 162:1-10. Jordan received and reviewed this letter. *See id*.

Dated: July 24, 2015

Respectfully submitted,

NUCARE SERVICES CORP.

By:/s/ Sonya Rosenberg
 One of Its Attorneys

Jason C. Kim
Sonya Rosenberg
David G. Weldon
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 1700
Chicago, IL  60602-3801
(312) 269-8000

## **CERTIFICATE OF SERVICE**

I, Sonya Rosenberg, an attorney, hereby certify that a copy of the foregoing ***Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1*** was served upon the following parties electronically (via ECF) on July 24, 2015:

> Edward M. Fox
> Ed Fox & Associates
> 300 West Adams Street, Ste. 330
> Chicago, IL 60606
> (312) 345-8877
> efox@efox-law.com

                                        By:/s/ *Sonya Rosenberg*
                                            One of Defendant's Attorneys

21459382.4