# TAB D

1        IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF ILLINOIS

3            EASTERN DIVISION

4  BARBARA KUEBLER and       )

5  JEANNETTE JORDAN,        )

6          Plaintiffs,   )

7    -vs-           ) Case No. 14 CV 05265

8  NuCARE SERVICES CORP., an  )

9  Illinois Corporation,    )

10          Defendant.    )

11     The deposition of DAVID HARTMAN, called

12  for examination pursuant to the Rules of Civil

13  Procedure for the United States District Courts

14  pertaining to the taking of depositions, taken

15  before ATHANASIA MOURGELAS, a notary public within

16  and for the County of Cook and State of Illinois,

17  at 300 West Adams Street, Suite 330, Chicago,

18  Illinois, on the 8th day of June, 2015, at the hour

19  of 1:30 o'clock p.m.

20

21

22

23  Reported by:  Athanasia Mourgelas

24  License No. 084-004329



1    Q.   Generally do you recall her job
2  responsibilities?
3    A.   She was involved with the clinical
4  operations.
5    Q.   And Tim Fields, do you recall his job
6  title in January of 2013?
7    A.   I don't recall his job title at that
8  moment.
9    Q.   Generally what was his responsibilities at
10  that time?
11    A.   Marketing.
12    Q.   And can you describe as of January of 2013
13  just generally the business of NuCare?
14    MS. ROSENBERG:  Objection, form.
15    THE WITNESS:  We did a lot of things.  My
16  primary concept was to take care of patients.
17  BY MR. FOX:
18    Q.   And then you had -- NuCare had liaisons
19  working for them; is that correct?
20    A.   That is correct.
21    Q.   And the primary responsibility of liaisons
22  was to try to get referrals of patients from
23  hospitals into various nursing homes, is that a
24  fair statement?



1      MS. ROSENBERG:  Objection, form.

2      THE WITNESS:  They had multiple jobs.

3    BY MR. FOX:

4      Q.   Was that one of them?

5      A.   Yeah.

6      Q.   Could you describe what some of their

7    other jobs were?

8      A.   Their role was to play a liaison between

9    the hospital and the facilities.  Their role was to

10   assess the patients in the hospital both clinically

11   and socially.  Their role was to create

12   relationships with the social workers, discharge

13   planners and the hospitals and their roles were to

14   help facilitate referrals into the building.

15     Q.   And all of these job descriptions that

16   you've just given, were they all -- was the

17   ultimate goal of the liaisons then to try and get

18   referrals and admissions of patients and hospitals

19   to various nursing homes?

20     A.   Yes.

21     Q.   Now, in the context of your job on a

22   day-to-day basis, can you describe in the month --

23   like around the month of January of 2013, what you

24   did in connection with NuCare?



1    A.    It could be.

2    Q.    And when you say building, are you

3  referring to a nursing home?

4    A.    Yes.

5    Q.    And in a meeting that you would attend in

6  which liaisons were also present, were these

7  regularly scheduled or not?

8    MS. ROSENBERG:  Objection, form.

9    THE WITNESS:  I don't remember.  I really

10 don't.

11 BY MR. FOX:

12   Q.    In your job when you were president of

13 operations, did you have anything to do with the

14 hiring of liaisons?

15   A.    No.

16   Q.    And who would that have been back --

17   A.    Tim Fields.

18   Q.    And then how about when you were president

19 of operations, how about firing, who was in charge

20 of firing?

21   A.    That would also be Tim Fields.

22   Q.    When Tim Fields would do a hire when you

23 were president of operations, did he make you aware

24 of each new liaison that you hired?



1      MS. ROSENBERG:  Objection, form.

2      THE WITNESS:  Yes.

3  BY MR. FOX:

4      Q.   And can you describe to me what he would

5  do to make you aware of each new liaison hired?

6      MS. ROSENBERG:  Same objection.

7      THE WITNESS:  He would probably either call me

8  or let me know in person that he was hiring someone

9  new for a certain area.

10  BY MR. FOX:

11      Q.   And when he would do this, typically did

12  he give you information about the person or just

13  let you know the name of the person?

14      A.   Not always.

15      Q.   And then in connection with terminations

16  of people, involuntary terminations of people,

17  would Tim Fields make you aware of any terminations

18  he was planning before it happened?

19      MS. ROSENBERG:  Objection, form.

20      THE WITNESS:  What are you asking?  What are

21  you looking for?

22  BY MR. FOX:

23      Q.   Well, from time to time, is it accurate to

24  say that Tim Fields would fire a liaison for one



1   reason or another?

2       A.   Yes.

3       Q.   On occasions when he did this, would he

4   make you aware of his plan to do that before it

5   happened?

6       MS. ROSENBERG:  Objection to form.

7       THE WITNESS:  He may make me aware that

8   something may be wrong.

9   BY MR. FOX:

10      Q.   Was it his obligation to get your approval

11  for involuntary terminations?

12      A.   No.

13      Q.   Again, when you were president of

14  operations, did you make a point to meet all the

15  liaisons face to face at one time or another that

16  were working for you?

17      MS. ROSENBERG:  Objection to form.

18      THE WITNESS:  I don't recall.

19  BY MR. FOX:

20      Q.   When Barb Kuebler and Jean Jordan came to

21  work -- when either one of them came to work for

22  NuCare, were you made aware of that?

23      A.   Yes.

24      Q.   And can you tell me how you were made



# TAB E

IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF ILLINOIS

3               EASTERN DIVISION

4

5  BARBARA KUEBLER and          )

6  JEANNETTE JORDAN             )

7          Plaintiffs,          )

8          -vs-                 )No. 14 CV 05265

9  NuCARE SERVICES CORP., an    )

10 Illinois Corporation         )

11          Defendant.          )

12

13          The deposition of LORIN LIBERSON, called

14 for examination pursuant to Notice and the Rules of

15 Civil Procedure for the United States District

16 Courts pertaining to the taking of depositions,

17 taken before April T. Hansen, a Certified Shorthand

18 Reporter within and for the County of Cook and

19 State of Illinois, at 300 West Adams Street, Suite

20 330, Chicago, Illinois, on the 7th day of May,

21 2015, at the hour of 9:30 a.m.

22

23 Reported By:  April T. Hansen, CSR, RPR

24 License No.:  084-004043



1      A.    It was a promotion.

2      Q.    Then how long did you work at NuCare?

3      A.    Three years and two months I believe.

4      Q.    Did you have a single job title at NuCare

5  or did it change over time?

6      A.    Single.

7      Q.    What was it?

8      A.    Regional VP of business development.

9      Q.    Where did you work before NuCare?

10     A.    Lexington.

11     Q.    What did you do for them?

12     A.    Director of business development.

13     Q.    Just generally, what were your

14  responsibilities at Lexington?

15     A.    I oversaw business development

16  for the home care side of the business.

17     Q.    How long at Lexington?

18     A.    Two years.

19     Q.    Why did you leave Lexington?

20     A.    Job offer at NuCare.

21     Q.    Then before Lexington where did you work?

22     A.    Before Lexington I believe I was in -- I

23  was at Advanced Bionics.  I'm sorry, this was a

24  very short job space.  I was at Advanced Bionics



1   stuff like you were saying.  It might be that, you

2   know, we all sat down and talked about census if

3   something was low in a region.  So it just

4   depended.

5   BY MR. FOX:

6       Q.   You had employees that reported to you

7   while you were at NuCare, correct?

8       A.   Correct.

9       Q.   How many?

10      A.   It changed by territory, and my territory

11  changed.  So on average, I don't know, maybe about

12  four to six liaisons at a given time.

13      Q.   Were there meetings in which you discussed

14  liaisons, just any liaison, with David Hartman?

15      MS. ROSENBERG:  Objection to form.

16      THE WITNESS:  We always discussed census, so it

17  wasn't discussing people.

18  BY MR. FOX:

19      Q.   Liaisons, at least in part, had the

20  responsibility for trying to get folks that were in

21  hospitals to be admitted into various nursing

22  homes.  Is that an accurate statement?

23      A.   Yes.

24      Q.   And did you ever have conversations in any



1     A.    To the best of my knowledge, yes.

2     Q.    Then with your liaisons, as of February of

3  2013, did you have scheduled periodic meetings with

4  them?

5     A.    Uh-huh.  Yes.  Sorry.

6     Q.    What was the schedule?

7     A.    So the buildings had a mandatory monthly

8  marketing meeting, but we often did weekly

9  marketing meetings if census goals were not where

10  they should be.  And the liaisons' attendance was

11  required at these meetings.

12     Q.    Then we talked about one of the

13  responsibilities or a responsibility of a liaison

14  was trying to get folks admitted from their

15  hospitals into skilled nursing facilities?

16     A.    Uh-huh.

17     Q.    What were the other responsibilities of

18  liaisons who worked under your supervision?

19     A.    We asked them to do some physician

20  development.  So often that was as simple as

21  reporting back maybe the big admitters in the

22  hospital.

23     Q.    I'm sorry?

24     A.    The big admitters.  If there are any

1  specialty programs happening at the hospital, just

2  keeping us in tune with physician-wise what's

3  happening.  We also asked them to schedule events,

4  or -- I guess events is the best word, for our

5  social workers and case managers.  So that could be

6  an educational event, which includes like a credit.

7  We call them CEUs.

8          And then -- so really, I mean,

9  everything was very relationship-based and all of

10  it was, you know, geared towards getting them to

11  produce out of their hospitals.  So doctors and

12  social workers are the two main sources of

13  referrals.

14    Q.  When you say everything was geared towards

15  getting them to produce, you're referring to

16  getting them to get patients from the hospitals

17  admitted to their specific nursing homes?

18    MS. ROSENBERG:  Objection to form.

19    THE WITNESS:  Correct.  And they all had goals.

20  So that's the production that I'm speaking of, is

21  meeting and exceeding their goals.

22  BY MR. FOX:

23    Q.  So let's talk about the goals for a

24  moment.  When you say they all had goals, were



1    it very closely.

2    BY MR. FOX:

3        Q.   So what would determine -- and just so

4    we're on the same page, an action plan is -- please

5    describe what an action plan is.

6        A.   An action plan is exactly what it sounds

7    like.  It is guiding a liaison through the next 30

8    days, in this case a liaison, guiding an employee

9    through the next 30 days and giving them actionable

10   goals that we want them to accomplish.

11             The idea is that it's almost micro

12   management in a way.  It's showing them exactly

13   what we want them to do, in the hopes that it will

14   lead them down a path of success.

15       Q.   When an action plan was given, based upon

16   the practice and procedure, was it the intent that,

17   if the liaison didn't meet the goals set forth in

18   the action plan, that the liaison would be

19   terminated?

20       MS. ROSENBERG:  Objection.  Form.

21       THE WITNESS:  Yes.  Usually action plans lead

22   to termination.  People don't get put on action

23   plans because they're doing well.

24



BY MR. FOX:

Q.   Then who would determine whether or not a particular liaison would be placed on an action plan?

MS. ROSENBERG:  Objection.  Form.

THE WITNESS:  It's just numbers.  I mean, if they're not meeting their goals, then we have to get them back on track.  That's our business.

BY MR. FOX:

Q.   But the decision to put an employee on an action plan, whose decision was that?

MS. ROSENBERG:  Same objection.

THE WITNESS:  Tim.  I mean, I didn't make decisions that were not overseen by Tim.

BY MR. FOX:

Q.   So would Tim initiate a discussion with you?  For example, if a liaison was not meeting her goals, would it be Tim that would initiate a conversation with you and say so-and-so needs to be put on an action plan or something to that effect?

MS. ROSENBERG:  Objection.  Form.

THE WITNESS:  Yeah.  That's fair.  Yes.

BY MR. FOX:

Q.   For the employees that worked under your



1   decision that the patient wouldn't be suitable for

2   a particular nursing home.  Would that ever happen?

3       MS. ROSENBERG:  Objection to form.  And lack of

4   foundation.

5       THE WITNESS:  That wouldn't be appropriate?

6   What does that mean?

7   BY MR. FOX:

8       Q.   Well, for a medical reason for example.

9   If a nursing home -- I don't know if this is an

10  accurate example, but hypothetically, if a patient

11  had dementia and a nursing home wasn't equipped to

12  handle dementia patients or the dementia beds were

13  filled up.  So would the type of patient impact the

14  ability sometimes to get a patient admitted?

15      MS. ROSENBERG:  Same objections.

16      THE WITNESS:  If medically we weren't able to

17  care for the patient, then, yes, we would not

18  accept them.

19  BY MR. FOX:

20      Q.   Then in the liaisons' -- well, did you

21  ever do the hiring of liaisons?

22      A.   I was involved usually in the interview

23  process.

24      Q.   Did you have input into the decision to



1  hire or not hire a prospective liaison?

2      MS. ROSENBERG:  Objection to form.

3      THE WITNESS:  I mean, there was communication.

4  I think Tim made the ultimate decision on these

5  things, though.

6  BY MR. FOX:

7      Q.   What were the qualifications that were

8  required for a liaison?

9      A.   It's a very difficult question to answer.

10     Q.   Okay.  Well, did they need to have some

11 sort of medical field background?

12     MS. ROSENBERG:  Objection to form.

13     THE WITNESS:  Usually our liaisons, with very

14 few exceptions, did have experience either in our

15 field of skilled nursing or some health care type

16 of field, or they were a nurse.

17 BY MR. FOX:

18     Q.   What about educational background?  What

19 was the requirement of that?

20     MS. ROSENBERG:  Same objection.

21     THE WITNESS:  No, there wasn't anything to my

22 knowledge that was like a minimum.

23 BY MR. FOX:

24     Q.   What about work background?  Was there any



1   ask.  The hospitals are very clear that they don't
2   direct referrals.
3          But the other piece is that physicians
4   also come on board at our facilities and follow
5   patients.  So that's another avenue by which we
6   would need to know who our physicians are at our
7   hospitals.
8   BY MR. FOX:
9       Q.   For Barb Kuebler, were you involved in her
10  transfer from the Symphony side over to the NuCare
11  side?
12      A.   No.
13      Q.   So how did you first find out that she was
14  coming on to the NuCare side?
15      A.   A phone call from Tim.
16      Q.   What did he say?
17      A.   "Barb will be joining your territory and
18  we're going put her at UIC."
19      Q.   Did he indicate anything else about Barb
20  in coming over when you had this phone call with
21  him?
22      A.   No.  He knew I knew Barb from Lexington,
23  so it was actually a positive conversation.  I was
24  excited.



1    Q.   When you said it was a positive

2  conversation, did he have good things to say about

3  Barb at that time?

4    MS. ROSENBERG:  Objection to form.

5    THE WITNESS:  The conversation went, "Do you

6  remember Barb from Lexington?"  And I said yes.  He

7  said, "I have good news.  She's coming to the city,

8  she's going to be at UIC."

9  BY MR. FOX:

10    Q.   Did you have any further conversations

11  with Tim Fields about Barb before she actually came

12  over to be under your supervision?

13    A.   I knew that she worked in Joliet.

14  That's the extent of what I knew.

15    Q.   You didn't know anything else about her

16  work, then, at Joliet?

17    A.   No.

18    MS. ROSENBERG:  Objection.  Asked and answered.

19  BY MR. FOX:

20    Q.   So I take it from your answers you were

21  looking forward to having Barb come work under your

22  supervision at that time?

23    A.   Correct.

24    Q.   Did Tim say anything bad about Barb?



1     A.   No.

2     Q.   Did anybody else say anything bad about

3  Barb before she came to work for you?

4     A.   No.

5     Q.   Then you said you knew Barb when she

6  worked at Lexington?

7     A.   Correct.

8     Q.   What was you're working relationship like

9  at Lexington?

10    MS. ROSENBERG:  Objection to form.  And lack of

11  foundation.

12    THE WITNESS:  We obviously both worked for the

13  same company, but I was at home care and she was on

14  the skilled nursing side.  So, honestly, we

15  communicated while we were there just in the case

16  of, like, if I was going to one of her hospitals, I

17  would give her a heads up.  And, you know, we

18  developed a friendship I felt at Lexington.  But

19  nobody reported to the other.  We just talked.

20  BY MR. FOX:

21    Q.   So would it be fair to say you didn't have

22  any opinions of her work performance while she was

23  at Lexington?  Or did you?

24    A.   No, I didn't know any of that piece.  I



1   just saw her as a friend.

2       Q.   Then what was the reason she was put at

3   UIC when she came under your supervision?

4       MS. ROSENBERG:  Objection to lack of

5   foundation.

6       THE WITNESS:  I was not privy to that

7   conversation.  I heard rumors, but that was it.

8   And I heard them after the fact.  So I wasn't privy

9   to any of that.  That was not part of the

10  conversation Tim had with me.

11  BY MR. FOX:

12      Q.   I guess what I'm asking is do you know why

13  she was given UIC as opposed to another hospital?

14      A.   No.  Well, I think we had been looking to

15  place somebody at UIC for some time.  We had always

16  had a shared liaison with Rush and UIC, and it was

17  always a little too much for one person.

18      Q.   So before Barb came you had one person

19  responsible for both Rush and UIC?

20      A.   Yes.

21      Q.   And it was decided that you wanted to have

22  just one person at UIC; is that correct?

23      A.   The territory was such that the liaison

24  that shared the two was constantly saying that



1  there was too much for her to handle.  So that was

2  something that was on our plans, was to separate

3  the hospitals and have two liaisons.

4      Q.   What was the name of the liaison who had

5  been handling UIC?

6      A.   Honestly, I can't remember, because we had

7  a couple turnovers at the hospital.

8      Q.   So after Barb came on board under your

9  supervision, did you have an introductory meeting

10  with her at all to go over your expectations with

11  her?

12      A.   I can't remember.

13      Q.   During the first month that she was there

14  do you remember any sort of meeting with her in

15  which you went over your expectations for her?

16      A.   Tim would handle that.  I know that he

17  also facilitated her transfer from the Joliet area

18  up to the city.  So I'm going to assume that he had

19  a conversation with her about where that hospital

20  was producing currently and kind of where we would

21  like it to go.

22      Q.   During the first month that she was there

23  did you give her any sort of document that would

24  indicate her goals or bonus numbers or things like



1  that?

2      A.    Again, I think that would come from Tim.

3      Q.    So at some point in time Barb was put on

4  an action plan.

5      A.    Yes.

6      Q.    And before she was put on that action

7  plan, did you have any discussion with Barb in

8  connection with any performance issues that she was

9  having?

10     MS. ROSENBERG:  Objection to form.

11     THE WITNESS:  We were having weekly phone calls

12  where we were going over the activity in the

13  hospital.

14  BY MR. FOX:

15     Q.    In any of these weekly phone calls did you

16  go over any problems, if any, that you were having

17  with her performance before the action plan?

18     MS. ROSENBERG:  Objection to form.

19     THE WITNESS:  I can't recall.

20  BY MR. FOX:

21     Q.    So at the time that you put Barb on an

22  action plan, whose decision was it that that would

23  happen?  Yours?  Tim's?  Or somebody else?

24     A.    Tim.



1    Q.   So how did Tim convey this information to

2  you?

3    A.   We talked about census every day.

4  Everyone saw the trending that was happening, in

5  this example at UIC, and we discussed it

6  frequently.  It was a pretty big disparity between

7  what it was producing and what it was currently

8  producing during Barb's tenure.  So it was a

9  conversation.

10    Q.   Is it true that at that time many

11  hospitals were producing less admissions into

12  nursing homes under your supervision than the year

13  before?

14    A.   I'm not aware of that.

15    MS. ROSENBERG:  Objection to form.

16  BY MR. FOX:

17    Q.   Have you ever seen the numbers for the

18  admissions from all your hospitals into nursing

19  homes while you were at NuCare during the year

20  2013?

21    MS. ROSENBERG:  Objection to form.

22    THE WITNESS:  Like a company report do you

23  mean?

24



1  BY MR. FOX:

2      Q.   Any document.  Any spreadsheet or any

3  document that would indicate how many admissions

4  were coming from hospitals under your supervision?

5      A.   Yes.

6      Q.   As you sit here now, you don't recall if

7  other hospitals were having lesser admissions in

8  2013 than 2012?

9      A.   No.  I mean, the company year over year

10  grew.  So, you know, I don't recall that.  We

11  looked at each hospital and, you know, it's normal

12  that hospitals trend up.  But it's not normal that

13  they trend up, up, up, and then take, like, a big

14  dip.  The dips are what signal to us that we need

15  to investigate.

16      Q.   Okay.  So would it surprise you, if you

17  looked at the numbers from the hospitals, if you

18  saw that most of the hospitals had taken a dip in

19  2013?

20      A.   Yes, it would surprise me.

21      MS. ROSENBERG:  Objection to form.

22  BY MR. FOX:

23      Q.   So when you had these discussions with Tim

24  about the census, I take it that Barb, before you



1  gave her the action plan, I take it that during

2  these conversations was discussion with Tim about

3  putting her on an action plan?

4      MS. ROSENBERG:  Objection to form.

5      THE WITNESS:  We discussed the trending at the

6  hospital, where the census was, what her admissions

7  were.  And, yes, when it continued and it wasn't

8  getting better, yes, we had to essentially micro

9  manage, which is what an action plan is.

10  BY MR. FOX:

11     Q.  So what did Tim say about putting Barb --

12  what did he specifically say about putting Barb on

13  an action plan?

14     MS. ROSENBERG:  Objection to form.

15     THE WITNESS:  I have no idea.

16  BY MR. FOX:

17     Q.  So the action plan that was given to Barb,

18  it was created by you?

19     A.  Correct.

20     Q.  And you created all the goals in it; is

21  that correct?

22     A.  Under his approval.

23     Q.  Okay.  So I take it you created an action

24  plan then you gave to Tim to look at before you



1  gave it to Barb?

2      A.   Correct.

3      Q.   Did he approve the one you gave him?  Or

4  did he ask for any changes in it?

5      A.   He approved it.

6      Q.   Then after you did that, you met with Barb

7  about the action plan?

8      A.   Yes.

9      Q.   When you met with her about the action

10  plan, did you tell her that you were giving an

11  action plan to all the liaisons under your

12  supervision?

13      A.   I do recall that that question was asked,

14  and I did tell her at that time that everybody was

15  being told what their goals were, and that was some

16  type of an action plan.  The difference is they

17  weren't all written up.  Because if they were

18  meeting their goals and/or exceeding them, there is

19  no need to actually type up a full action plan.

20          But actions plans are truly just to

21  manage somebody towards a goal.

22      Q.   So I guess getting back to my question,

23  did you tell Barb that you were putting everybody

24  under your supervision on an action plan?



1                    (Whereupon, Liberson Deposition

2                    Exhibit No. 1 was marked for

3                    identification.)

4    BY MR. FOX:

5        Q.   Putting aside the handwriting on it for a

6    moment, I'm just talking about the typed piece of

7    it.  Is that a copy of the action plan that you

8    gave Barb?

9        A.   Yes.

10       Q.   Then whose handwriting is on here?

11       A.   Mine.

12       Q.   When did you put this handwriting on here?

13       A.   I wrote on this when I was actually

14   meeting with Barb for the -- no, for the whole

15   part.  So we were just taking notes as we talked.

16       Q.   So this says, in part -- well, toward the

17   bottom under the UIC, the April 24 date was cut,

18   was crossed off and changed to 26 to May 26.  Do

19   you see that?

20       A.   Uh-huh.

21       Q.   Why was that crossed out, those dates?

22       A.   Because I had prepared this prior to

23   meeting with her.

24       Q.   So do you remember what day you met with



1          It says weekly updates forwarded to
2    RVP.  Updates to include hospital census, number
3    two is total number of referrals/evaluations, and
4    number three is progress and outcome with specific
5    hospitals' CM/CW and MDs.
6          Were these things that she was not
7    doing before this action plan?
8       A.   Correct.
9       Q.   Were these things that she was asked to do
10   before this action plan?
11      A.   No.
12      Q.   So this is the first time she's being
13   requested to do these things listed?
14      A.   Correct.
15      Q.   Then the next bulleted point, which is
16   CEU, what does CEU stand for?
17      A.   Continuing education unit.
18      Q.   And then scheduled with CM/SW staff.  Can
19   you tell me is the CM case manager?
20      A.   Yes.
21      Q.   And SW is a social worker?
22      A.   Yes.
23      Q.   And what does that mean, that bullet point
24   that you have there?



1    A.   What it says.  In the next 30 days I want

2  her to schedule a CEU with the case manager and

3  social worker team.

4    Q.   What does this mean, to have a CEU with

5  the case manager and social worker team?

6    A.   It means it's something that happens at

7  the hospitals that post acute providers do.  So we

8  schedule a meeting, we bring in an educator, and

9  it's an opportunity for us to have five to ten

10  minutes of marketing time in front of the whole

11  team.

12    Q.   Now, this is something Barb was asked to

13  do before this action plan was given to her?

14    MS. ROSENBERG:  Objection to form.

15    THE WITNESS:  This is something that all of our

16  liaisons do at all of our hospitals.

17  BY MR. FOX:

18    Q.   Was this something that she had not done

19  to your knowledge before this action plan?

20    A.   I don't know.

21    Q.   Okay.  Then the next bulleted point,

22  program blitz.  And you indicate here develop a

23  creative plan to highlight programs every week to

24  hospital case managers, social workers, and MDs.



1    Creative marketing blitzes, give-aways, et cetera.

2            Is this something that Barb was

3    expected to do before you gave her the action plan?

4        MS. ROSENBERG:  Objection.  Form.

5        THE WITNESS:  Yes.

6    BY MR. FOX:

7        Q.   Was this something that she was or was not

8    doing before the action plan was given to her?

9        A.   Not doing.

10       Q.   Did you tell her to do this before the

11   action plan was given to her?

12       A.   Being in sales, it's an expectation that

13   she needs to be marketing what we have in each of

14   our facilities.

15       Q.   Was this something that you told her that

16   she should do before you gave her this action plan?

17       MS. ROSENBERG:  Objection.  Asked and answered.

18   BY MR. FOX:

19       Q.   You can answer.

20       A.   We had asked -- we constantly talked

21   about, at NuCare, that these are the programs, this

22   is what you talk about at your hospitals, this is

23   how you get business.  You talk about these things.

24       Q.   Do the liaisons under your supervision



1  during the year 2013, do they get some sort of

2  documented work material about what their

3  expectations were from NuCare?

4      A.   I don't understand.

5      Q.   Sure.  When a liaison comes to work at

6  NuCare, say as of the beginning of 2013, do they

7  get some sort of handbook or folder or some

8  information from NuCare about what their

9  expectations were and what was expected from them?

10     MS. ROSENBERG:  Objection.  Lack of foundation.

11     THE WITNESS:  Like, in relation to this type of

12  stuff?  Like marketing type of things?

13  BY MR. FOX:

14     Q.   Correct.

15     A.   Like a booklet?

16     Q.   Correct.

17     A.   No.  But we talked about this stuff every

18  single day.

19     Q.   Okay.  And then the next bulleted point,

20  schedule meeting/hospitals visits with any SW staff

21  that you have not met.

22          This would have been an expectation

23  of her, this bulleted point, before this action

24  plan?



1      A.   Absolutely.

2      Q.   All right.  Did you know one way or

3 another whether she had done this or not done this

4 as of the time you gave her this action plan?

5      A.   There was conversations that she felt that

6 she didn't, you know, know social workers over at

7 UIC.

8      Q.   All right.  Now, the next bulleted point

9 is plan off site lunch or dinner with case

10 manager/social work staff.  Happy hour drinks,

11 et cetera.

12           Was this something that had been --

13 that Barb had been asked to do before you gave her

14 this action plan?

15      A.   This is a conversation that I have with

16 all of my liaisons.  These are all basic marketing

17 suggestions, and these are all things we talk about

18 on a regular basis.

19      Q.   Okay.  And do you know if she had done

20 this before being given this action plan?

21      A.   Not to my knowledge.

22      Q.   Okay.  Well, do you know one way or the

23 other?

24      A.   No, I don't know one way or the other.



1    Q.   Then the last bulleted point is you wanted

2  her to identify three key MDs that do not currently

3  refer to NuCare.

4            Is this something she had been asked

5  to do before you gave her this action plan?

6    A.   It is an expectation that we know who our

7  physicians are in our hospitals.  Specifically if

8  they don't come or know about us.

9    Q.   Okay.  Do you know if she had done this

10  one way or the other before you gave her this

11  action plan?

12    A.   No, she had not.

13    Q.   And when you say identify three key MDs,

14  how do you arrive at the number three?

15    A.   That is usually the number that we give

16  our liaisons.  There is usually the top three

17  admitters within hospitals.  It's just sort of a

18  standard in the industry.

19    Q.   Now, under that section you have specific

20  hospital targets, and you have admission targets,

21  new referrals that convert to admission in any of

22  the NuCare facilities.

23    A.   Uh-huh.

24    Q.   And then you have UIC, and you have April



1    26 through May 26, 15 admissions.

2              Do you know how you arrived at the

3    number of 15 admissions?

4         A.   So, again, if this was -- I would have

5    taken that same month a year ago and looked at

6    where we were, and then I would have looked at what

7    her goal was.  And I probably would have chosen

8    sort of a step in-between so that it was a

9    reasonable goal for her.

10        Q.   So do you know that in April of the year

11   before there were four admissions from UIC?

12        A.   No.

13        Q.   And do you know in May of the year before

14   they were 13 admissions from UIC?

15        A.   Okay.

16        Q.   Did you know that?

17        A.   I'm certain I must have known it at the

18   time.  I don't know it now.

19        Q.   Assuming those numbers are correct, there

20   were 4 in April and 13 admissions in May, do you

21   know why you would picked 15 admissions for her

22   goal?

23        A.   Well --

24        MS. ROSENBERG:  Objection to form.



1    THE WITNESS:  I think that we need to look
 2   back, too, and see where the trending was.  Because
 3   she was with us in February, she was with us in
 4   March, and now here we are in April.  And so I
 5   would have a look at that whole piece, too.  So if
 6   there was one off month over a year ago, that's not
 7   going to change her overall goal.
 8   BY MR. FOX:
 9       Q.   Do you know what the average admissions
10   were from UIC in the year 2012?
11       A.   I'm sure I looked at it.  I can't recall
12   right now.
13       Q.   Would 10.2 sound surprising to you?
14       A.   It would sound low.
15       Q.   So if the average number of admissions
16   from UIC from a year ago were 10.2, do you know how
17   you would arrive at 15 for her goal on this piece
18   of paper?
19       MS. ROSENBERG:  Objection to form.
20       THE WITNESS:  There are two things that are
21   happening here.  One is that obviously we want
22   growth within our hospitals.  But number two, we're
23   also placing a full-time person here.  So if a year
24   ago we had 10.2 with a shared liaison, so



1 essentially they are getting a part-time person, it
2 would seem very reasonable to me that a full-time
3 person would do more than that.
4 BY MR. FOX:
5     Q.  So you're testifying now that the goals
6 weren't just based upon the previous year's
7 numbers, it's based on more than that.  Is that
8 what you're testifying?
9     MS. ROSENBERG:  Objection to form.
10     THE WITNESS:  I'm not sure that I understand.
11 What does "more than that" mean?
12 BY MR. FOX:
13     Q.  You testified now you're basing your
14 numbers on the fact that you had a single liaison
15 at UIC as opposed to a liaison handling both UIC
16 and Rush at the same time?
17     A.  Well, it's common sense.
18     Q.  Okay.  And it's common sense that you're
19 going to improve the number by an average of five a
20 month?  Is that what you're saying?
21         Let me ask it this way.  Do you have
22 experience in hospital admissions being increased
23 by roughly 50 percent from one year to the next?
24     MS. ROSENBERG:  Objection to form.



1    THE WITNESS:  We -- again, we look at what we

2  got in the past.  And oftentimes, I can't speak

3  specifically for UIC, but if we look back and we

4  say, you know, this hospital hit this target at

5  some point, we now have somebody that is assigned

6  to this hospital by themselves, this is a

7  reasonable goal.

8         We do not come up with unreasonable

9  goals.  That doesn't make sense.  Our job is to

10  make her successful.  We wanted her to succeed.  We

11  want her to hit these goals.

12  BY MR. FOX:

13     Q.   So the goal of these action plans is given

14  to her because you wanted her to succeed?

15     A.   Absolutely.

16     Q.   Okay.  The handwriting that you have on

17  here, you say, "put a plan in place for Norwegian,"

18  and there is some more writing there.

19            Do you remember why you put that in

20  there?

21     A.   This was a new hospital for -- not new for

22  our company, but it just hadn't really had a person

23  really dedicated to it.  It always was sort of one

24  of those hospitals we would send somebody out when



1    Q.   So you're saying you tried to keep the

2   meetings positive.  I take it you did not tell her

3   she would be terminated if she did not meet the

4   goals?

5    MS. ROSENBERG:  Objection to the extend the

6   question mischaracterizes testimony given.  And

7   asked and answered.

8    THE WITNESS:  Can you repeat that?

9   BY MR. FOX:

10    Q.   Sure.  By you indicating that you tried to

11   keep the meetings positive, is it your testimony

12   that you likely did not tell her that she would be

13   terminated if she did not meet the goals set forth

14   in this plan?

15    MS. ROSENBERG:  Same objections.

16    THE WITNESS:  So a couple things.  One is, no,

17   I did not say to her, "Barb, I'm giving this to

18   you, and if you do not meet these goals on May 27,

19   you will be terminated."  What I did say was we

20   placed you in this hospital by yourself.  We expect

21   the numbers to grow because it's a full-time focus

22   now as a salesperson.  I'm going to work with you,

23   we have 30 days, I want to look through this stuff

24   and work with you to grow the census.

1      Again, be positive.  It's encouraging.

2  She's not going to respond to me saying if you

3  don't do this, I'm going to fire you.  She's going

4  to respond to I'm here.  I'm going to check in with

5  you weekly.  We're going to work together.

6      I really wanted her to succeed.  I really

7  liked her.  I was excited to have her join my team.

8  And it does not behoove me to have to make a change

9  in my hospital.  It really doesn't.

10  BY MR. FOX:

11     Q.  So was it your intent when you gave her

12  this action plan that she would be terminated if

13  she didn't make the 15?

14     A.  You have to wait as they're going through

15  the plan to see what happens.  People respond in

16  different ways, you know.  I have a current person

17  at my current job that I put on an action plan, and

18  they responded beautifully, and superseded the

19  expectations.  The action plan is off and they're

20  great.

21          So I think that there are times

22  people respond and they do fantastic.  There's

23  times that people go on these and they don't

24  respond and things don't change and it has to lead



1  the first two weeks we haven't seen any improvement

2  or effort, so we are most likely going down the

3  path of termination.

4  BY MR. FOX:

5      Q.   So let's be clear.  Go back to the last

6  exhibit, Exhibit 5, which is dated April 29, and

7  you just testified that, "Today begins the month

8  push for 15 admissions"; correct?

9      A.   Uh-huh.

10     Q.   So would you agree that May 5 is roughly

11  one week into the plan?

12     A.   Yes, one week.

13     Q.   So would it be accurate to say that one

14  week into the plan Tim is indicating he most likely

15  needs to proceed with the performance-based

16  termination?

17     MS. ROSENBERG:  Objection to lack of

18  foundation.

19     THE WITNESS:  Well, I mean, it's an action

20  plan.

21  BY MR. FOX:

22     Q.   Right.

23     A.   So you respond one of two ways.  Her first

24  week, if I recall correctly, there was no activity.



1  So, I mean, I can't speak for Tim on that.  All I
2  can say is, is that action plans are put in place
3  because somebody needs to take actionable measures
4  toward reaching goals.
5      Q.   Well, when you said she has done nothing
6  as of the first week, do you know if she had any
7  admissions the first week?
8      A.    I don't recall.  But I remember it was a
9  very bad first week, because it actually surprised
10  me.
11      Q.    Okay.  And did you indicate anywhere that
12  it was a bad week and that it surprised you?
13      A.    To her?
14      Q.    Did you indicate that to anybody anywhere?
15  In an e-mail?  Orally?
16      A.    I mean, it's on this e-mail.
17      Q.    What e-mail?
18      A.    That we had two things that were not
19  completed, and the other things that are still on
20  the list on Exhibit 2 that had not been attempted
21  yet.
22      Q.    Where does it say they were not attempted?
23      A.    They're still on here.
24      Q.    Where does it say it was not attempted?



1      MS. ROSENBERG:  Objection to form.

2      THE WITNESS:  It wouldn't be on there if they

3  were attempted.

4  BY MR. FOX:

5      Q.   Let me ask you this:  Did you say to Barb

6  as of May 5 or 6 that her job is in jeopardy or

7  anything to that effect?

8      A.   I can't speak for everyone in this room,

9  but if you're on an action plan, your job is in

10  jeopardy.  My job is to encourage her so that we

11  can get success.

12      Q.   Okay.  Then, again, looking at this, did

13  you recall any conversation with Tim Fields on or

14  about May 5, May 6, May 7, where he indicated to

15  you that it looked like they are going to wind up

16  terminating Barb Kuebler?

17      MS. ROSENBERG:  Objection to form.

18      THE WITNESS:  No.

19  BY MR. FOX:

20      Q.   All right.  So I'll show you the next

21  e-mail.

22                    (Whereupon, Liberson Deposition

23                     Exhibit No. 7 was marked for

24                     identification.)



1 effect?

2     MS. ROSENBERG:  Objection.  Asked and answered.

3     THE WITNESS:  No.

4 BY MR. FOX:

5     Q.  Okay.

6                 (Whereupon, Liberson Deposition

7                 Exhibit No. 10 was marked for

8                 identification.)

9 BY MR. FOX:

10     Q.  This is titled Liaison Accountability

11 Tracking Form on the top.

12     A.  Uh-huh.

13     Q.  You're familiar with these forms

14 generally?

15     A.  Yes.

16     Q.  How are these forms used, generally

17 speaking?

18     A.  This is how the liaisons report back to

19 the RVPs on what they are doing in their hospitals.

20     Q.  In this document at the right in the

21 column entitled Status, she has -- she put there,

22 in part, it says "Aria denied."  Do you know what

23 that means when a liaison writes the words "Aria

24 denied"?



1    Q.   Orally.  And what did you give her?

2    A.   Well, again, goals out of each hospital.

3  There was expectations on admissions.

4    Q.   Did you give her specific numbers that she

5  was expected to have before you gave her the action

6  plan?

7    A.   Correct.  There was goals for each

8  hospital that the liaisons were responsible for.

9    Q.   Is this documented anywhere to your

10  knowledge?

11    A.   To my knowledge, I am sure that it is.  I

12  don't have it with me or in front of me, but --

13    Q.   Do you know what kind of document it would

14  be based on?  Would it be an e-mail as opposed to a

15  form as opposed to something else?

16    A.   I don't know.

17    Q.   Before you gave her her action plan, were

18  you on notice of any complaints that anybody had

19  about her work performance?

20    MS. ROSENBERG:  Objection to form.  Lack of

21  foundation.

22    THE WITNESS:  No.

23  BY MR. FOX:

24    Q.   Okay.  Complaints from social workers or



1  physicians, anything like that?

2      A.   When I took over the territory?

3      Q.   And up to the time you gave her the action

4  plan.

5      A.   I mean, there were things that I had heard

6  sort of secondhand that, again, you hear things,

7  from her hospital that she kind of had an

8  aggressive personality.  But, you know, that's

9  about the extent of it.

10     Q.   Did anybody tell you about any complaints

11 from any nursing home administrators or staff in

12 connection with Jean?

13     MS. ROSENBERG:  Objection to form.

14     THE WITNESS:  Like Aria do you mean?  Is that

15 what you're asking?

16 BY MR. FOX:

17     Q.   Well, any nursing home.

18     A.   In our company?

19     Q.   Correct.

20     MS. ROSENBERG:  Same objection.

21     THE WITNESS:  You know, Jean was never overly

22 easy to work with, you know.  I think she had kind

23 of a defensive demeanor.

24



1    just wanted your best estimate.

2                Can you recall if Anne Ribordy was

3    put under an action plan while you were her

4    supervisor?

5        A.   Anne and I worked very closely on

6    developing her sales skills.  So it was more of a

7    goal plan with her that we met frequently to teach

8    her how to sell the bedside.  So because she was an

9    RN, so she knew a lot about clinic.  So

10   particularly, yes, she was under very close

11   supervision until she ramped up to that side of

12   business.

13       Q.   Did she ever get a written action plan

14   from you?

15       A.   No.  Because her numbers were never in

16   question.

17       Q.   If her numbers at Rush had gone down after

18   Barb took over at UIC, and seeing that she was only

19   focusing on Rush at that point in time, would that

20   cause you concern?

21       MS. ROSENBERG:  Objection.  Form.

22       THE WITNESS:  Sure.  If that had happened.

23   BY MR. FOX:

24       Q.   Now, going back to Jean, before you gave



1  Jean her action plan, did you have any discussions

2  with her about performance-related issues?

3      A.   I can't recall.  I don't know.

4      Q.   Then the decision to put Jean on an action

5  plan, whose decision was that?

6      A.   Again, based on numbers trending and where

7  we wanted them to be, if she wasn't meeting her

8  goals, then she would have gone on an action plan.

9  So that would have been a conversation I had with

10  Tim.

11      Q.   And he would have initiated putting her on

12  an action plan?

13      A.   Yes.

14      Q.   Then the goals for the action plan in

15  terms of admissions, were those numbers that you

16  came up with?

17      A.   Based on past performance where we wanted

18  her to be, yes.

19      Q.   When you gave her her first action plan,

20  did you do it personally in a meeting with her?

21      MS. ROSENBERG:  Objection to form.

22      THE WITNESS:  Yes.

23  BY MR. FOX:

24      Q.   Was anyone else present other than you and



1   she?

2       A.    No.

3       Q.    Do you remember where it was?

4       A.    Jackson Square.

5       Q.    Do you recall if you asked her to sign the

6   first action plan?

7       A.    I remember asking her to sign an action

8   plan.  I cannot remember any more details than

9   that.

10      Q.    You don't recall if she declined to sign

11  or not?

12      A.    The time I asked her, she declined to

13  sign.

14      Q.    Do you remember when you asked her to sign

15  the action plan?

16      MS. ROSENBERG:  Objection.  Asked and answered.

17      THE WITNESS:  No, I don't.  I don't recall

18  when.  I just know I had that conversation with

19  her.

20  BY MR. FOX:

21      Q.    Then with Jean, when she was given her

22  action plan by you, did you discuss with her --

23  tell me what you recall about your discussion with

24  her in connection with it?



1    A.   She was hostile and defensive.  And it was
2  a very uncomfortable meeting.  And her reaction to
3  me was, "Am I getting fired?"  That was pretty much
4  the extent of what she said.
5    Q.   Okay.  And then when you say she was --
6  can you recall anything other than "Am I getting
7  fired" that she said to you?
8    A.   No.
9    Q.   When she asked that question, how did you
10  respond?
11    A.   I told her that this is an action plan and
12  we need her to work towards these goals.
13    Q.   Did you say anything else in response to
14  that?
15    A.   No.
16    Q.   Do you recall anything else you said to
17  her in connection with the action plan?
18    A.   I don't.
19    Q.   Do you recall anything else you said to
20  her at the meeting?
21    A.   No.  We just reviewed the action plan.
22    Q.   Do you recall Jean saying anything about
23  problems that Aria was having and the reason why it
24  was difficult to get patients admitted into there?



1   yourself that she be fired for that, for not

2   meeting that goal as it's indicated here?

3       A.   Did I intend?  What does that mean?

4       Q.   Was it in your mind that Jean should be

5   fired at the time you gave her this action plan for

6   not meeting her goal?

7       A.   All I can say about these action plans is

8   they are either meeting their goals or they're not

9   meeting their goals.

10      Q.   Okay.  So what you're saying by that is

11  you don't make the decision on the termination?

12      A.   Correct.

13      Q.   All right.  So then if you look at the

14  column all the way to the right, new two week goal?

15      A.   Uh-huh.

16      Q.   Do you know why -- first of all, this is a

17  14-day action plan.  Do you know why she was put on

18  a 14-day action plan as opposed to a 30-day action

19  plan?

20      A.   I don't.

21      Q.   Had you ever put an employee before Jean

22  Jordan on a 14-day action plan?

23      A.   I can't remember.  I don't know.

24      Q.   Were action plans that you did typically



1  30 days?  Or was there no typical --

2      A.   You know, they were all different.  Just

3  like I said with Anne, I did something with her

4  that was based on sales.  I did something with Suzy

5  that was based on physician development.  Sometimes

6  they had days attached, sometimes they didn't.  So

7  they were all very customized to what we wanted

8  them to achieve.

9      Q.   The new two week goal numbers that you

10  have here, how did you arrive at those numbers?

11      A.   Well, the previous goals are the month.

12  So it basically is taking essentially half of that

13  and adding a little bit.  Because, again, the idea

14  is you want to grow a little bit with each month.

15  So we wanted five for the whole month in Elmhurst

16  before, you know, half of that would be two and a

17  half, so the new goal would be three because we are

18  asking her to grow just a little bit.

19      Q.   So even though -- were you done?

20      MS. ROSENBERG:  Were you done with your answer?

21      THE WITNESS:  Yeah, that's fine.

22  BY MR. FOX:

23      Q.   So even though she had only made one out

24  of the five in Elmhurst the previous month, you

1    A.   Once you're under an action plan, you're

2    under an action plan.  I mean, there is no rule

3    that says we have to wait until day 15 to fire you.

4    Q.   I understand there is no rule.  But I'm

5    just asking you what those documents mean.

6            So are you saying if she achieved

7    these goals, she would have been able to save her

8    job or not?

9    MS. ROSENBERG:  Objection to lack of

10   foundation.

11   THE WITNESS:  If she had achieved these goals,

12   yes.  I mean, that's why you put somebody on an

13   action plan.  You don't put them on an action plan

14   to fire them.  You put them on an action plan so

15   they will succeed and they know you're tracking

16   their numbers and you're working with them closely.

17   BY MR. FOX:

18   Q.   So do you know why they were terminated,

19   from conversation you might have had with Tim

20   Fields, before the two weeks had expired on the

21   action plan?

22   A.   I don't.

23   MS. ROSENBERG:  Objection to form.  And to the

24   extent it assumes facts not in evidence.



1    you're referring to individual nursing facilities?

2        A.    Correct.

3        Q.    Then your top e-mail where you says she

4    processes referrals to BP, SS, are those referrals

5    for other nursing homes?

6        A.    Yes.

7        MS. ROSENBERG:  Objection to lack of

8    foundation.

9    BY MR. FOX:

10       Q.    And then did you do that?

11       A.    I'm sure that I did, because I came up

12   with these numbers right here that showed her

13   previous goals or her actual goals based on what we

14   had previously stated on Exhibit 16.

15       Q.    Okay.  And do you recall if the numbers

16   that she was giving you on her trackers were

17   incorrect or correct?

18       A.    I don't.  I would like to say, though,

19   it's common for liaisons to put new admissions and

20   readmissions.  That's why we have to go back and

21   checked.  They have to be new admissions, meaning

22   they can't be readmissions.

23       Q.    Where are liaisons supposed to put it?

24       A.    They are supposed to notate it.  But



1   indicated here, is this looking like -- would you

2   use these documents to judge that activity of the

3   liaison preparing it or not?

4       MS. ROSENBERG:  Objection.  Asked and answered

5   a couple of times.

6       THE WITNESS:  Yes, I review these.

7   BY MR. FOX:

8       Q.   And how would you judge the activity based

9   on what you're looking at here?

10      A.   Well, we have the numbers that we put in

11  the action plan.  Then again, looking at the

12  status.  So, like, I'm looking at a couple of these

13  things that say you know they are accepted, but

14  they haven't been admitted or family chooses

15  somewhere else.  Or they have been at the building

16  previously, which would say to me that that's not

17  necessarily a new admission.  So, I mean, that's

18  what I see in just glancing at these.

19      Q.   The fact that somebody has been denied by

20  a nursing home, would that be the fault of the

21  liaison?  Or do they have control over that?

22      A.   No.  They don't have control over that.

23  But again, going back to the previous comment,

24  that, you know, it's has, you know, while they are



1  in the hospital, that's part of forming their

2  relationships is they get better quality referrals

3  over time.

4         Q.   I'm sorry.  Answer that again.

5         A.   The idea is when you're in these hospital

6  forming relationships, you get better quality

7  referrals over time because you're building those

8  relationships.  If you're getting referrals that

9  are going to be denied, it's because they are very

10  poor quality referrals.

11         Q.   So when you say --

12         A.   Things we can't manage, people without any

13  payer sources.

14         Q.   So when you say, like, over time you form

15  better relationships, what do you mean by that?

16  Relationships how?

17         A.   Well, that's what is on the action plans.

18  The social worker's needs, meet managers, she's

19  forming relationships with them so they trust her.

20  They think of her when they are ready to place a

21  referral.

22         Q.   That's what you mean that's what happened

23  over time, you form these relationships and things,

24  and you get better quality payer sources?



1    A.    Right.  I mean, that's the whole idea of

2    putting that on these action plans, is you want

3    them to form these relationships with people.  And

4    that's why it appears on the action plan.  It's a

5    very important part of their job.

6    Q.    Right.  So the time involved that a

7    liaison has worked at a hospital would have some

8    impact on their ability to obtain admissions --

9    MS. ROSENBERG:  Objection.  Asked and answered.

10   BY MR. FOX:

11   Q.    -- because of the forming relationships?

12   MS. ROSENBERG:  I apologize.  Again, objection.

13   Asked and answered.

14   THE WITNESS:  Again, you'll have how these

15   hospitals were performing prior.  The liaison does

16   need to get to know the case workers and manager,

17   but in theory, that's this only hospital.  She's

18   there eight hours day to day.  It shouldn't take

19   that long in building up.  That's your only job,

20   really.

21   BY MR. FOX:

22   Q.    All right.  So if we looked at -- like we

23   were talking about earlier, if we looked at Rush

24   Hospitals from January to June 2013?



1   are new admissions, or if any of them are

2   readmissions?

3       A.   That would be what we would have to go

4   back and check.  Because sometimes there was

5   confusion at the hospital side.  So there is no way

6   of looking at this to know if these are all

7   verified new admissions, no.

8       Q.   Lorin, did you know Jean's age while Jean

9   was working for the company?

10      A.   No.

11      Q.   Did you know Barb's age while Barb was

12  working for the company?

13      A.   No.

14      Q.   By "the company," I mean NuCare.  You

15  understand that, right?

16      A.   Yes.

17      Q.   Had you had any communications with Tim at

18  any point before Barb's or Jean's terminations in

19  which Barb's or Jean's ages were brought up,

20  referenced, or discussed in any manner?

21      A.   Absolutely not, no.

22      Q.   Did you yourself consider Jean's or Barb's

23  age in any manner in connection with their

24  performance action plans and the meetings you had



1   with them about their performance?

2       A.   No.

3       MS. ROSENBERG:  That's all I have.

4                     FURTHER EXAMINATION

5   BY MR. FOX:

6       Q.   So just going back to Exhibit 30 again, as

7   long as we're on it, you wrote an e-mail on July 10

8   and you said, "I thought we told them we wouldn't

9   fight the unemployment claims."  Do you see that?

10      A.   Yes.

11      Q.   What is that in response to?

12      A.   Carly's e-mail that says Jean just filed

13  for unemployment, assuming Barb is next, need to

14  fight the claims.

15      Q.   Did any of them -- well, why did you say,

16  "I thought we told them we wouldn't fight the

17  unemployment claims"?

18      A.   I must have had a conversation with Carly

19  at some point about that.

20      Q.   Do you recall Carly telling you why they

21  brought the unemployment claims or were intending

22  to or whatever?

23      MS. ROSENBERG:  Objection to form.  And

24  foundation.

