| | | |
|---|---|---|
| BARBARA KUEBLER and | ) | |
| JEANNETTE JORDAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 14-cv-5265 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| NUCARE SERVICES CORP., an | ) | |
| ILLINOIS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Plaintiffs Barbara Kuebler ("Kuebler") and Jeannette Jordan ("Jordan") (collectively, "Plaintiffs") bring this suit against their former employer, NuCare Services Corp. ("NuCare" or "Defendant"), alleging that NuCare violated the Age Discrimination in Employment Act ("ADEA") when it terminated them. Before the court is NuCare's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("motion"). For the reasons discussed in detail below, NuCare's motion is granted.

## I.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56 allows a movant to seek summary judgment when the opposing party's case consists of factually unsupported claims. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Simply put, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quotations omitted).

In order to survive a Rule 56 motion, the nonmoving party must either: (a) show that the movant cannot produce admissible evidence that a fact is not disputed, (b) show that the materials cited by the movant do not establish the absence of a genuinely disputed material fact, or (c) direct the court's attention to specific admissible evidence in "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that show that there is some genuinely disputed material fact. Fed. R. Civ. P. 56(c)(1); *see United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510–11 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." Also, it is "not the district court's job to sift through the record and make [a party's] case for him") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("like pigs, hunting for truffles buried in briefs.")). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In addition, "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal

quotations and citations omitted); *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.") Furthermore, at the summary judgment stage, "the court views the record in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255, and *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009)).

### A. Summary Judgment Submissions

In addition to complying with the Federal Rules of Civil Procedure, the parties must also adhere to the Local Rules for the Northern District of Illinois and this court's Standing Order. Local Rule 56.1 provides that the moving party shall serve and file:

1) any affidavits and other materials referred to in Fed.R.Civ.P. 56(e);

2) a supporting memorandum of law; and

3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law....

The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. L.R. 56.1(a). All argument must be contained in the party's brief, not in the Rule 56.1 statement. Standing Order at 1–2.

The party opposing summary judgment is required to respond with its own supporting evidence, memorandum, and "concise response to the movant's statement...." L.R. 56.1(b). The opposing party's Rule 56.1(b) statement should also contain "any additional facts that require the denial of summary judgment." *Id.* The opponent must include references to its supporting

materials.  *Id.*  Failure to respond to a statement results in the court admitting the statement as true.  *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

### B.  Plaintiffs' Statement of Additional Facts

As will be explained in greater detail below, NuCare claims that it terminated Plaintiffs because of their poor performance in placing hospital patients into nursing facilities.  Plaintiffs, on the other hand, argue that similarly situated employees who were not part of the protected class were treated more favorably.  More specifically, Plaintiffs argue that younger employees who underperformed were not terminated.

When they tendered courtesy copies of their statement of additional facts to the court, Plaintiffs submitted a disc containing spreadsheets that they claim were prepared and disclosed by NuCare during discovery.  The spreadsheets provide data regarding admissions numbers which are categorized by hospital, nursing facility, employee, and year.[1]  Although the spreadsheets were submitted to the court with Plaintiffs' statement of additional facts, the spreadsheets are never cited by Plaintiffs in support of their factual assertions.  Instead, Plaintiffs' counsel created charts that supposedly summarize the information he gathered from the spreadsheets.  He cited those charts in the statement of additional facts.  NuCare objected to the use of these charts because they constitute inadmissible double-hearsay.[2]  Nevertheless, NuCare responded to the substance of each of the additional facts asserted by Plaintiffs.

Plaintiffs then sought leave to respond to NuCare's objections to Plaintiffs' use of their attorney-created charts.  Plaintiffs contend that the charts are not hearsay because (1) the original spreadsheets produced by NuCare are considered an admission by a party-opponent pursuant to Federal Rule of Evidence 801(d)(2); and (2) the charts created by Plaintiffs' attorney are proper

---

[1] The data provides admissions numbers only from 2012 to 2014.
[2] The first level of hearsay is the spreadsheet produced by NuCare and the second level is Plaintiffs' counsel's creation of the charts based on his understanding of NuCare's spreadsheets.

summaries according to Federal Rule of Evidence 1006. NuCare does not deny that it prepared and produced the spreadsheets, but argues that Plaintiffs have not laid the proper foundation for their admission.

Admissibility is a threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment). *See also Bombard v. Fort Wayne Newspapers*, Inc., 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir.2001) (inadmissible hearsay is not enough to preclude summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial); *Bombard*, 92 F.3d at 562 (inadmissible hearsay from an affidavit or deposition will not suffice to overcome a motion for summary judgment).

Because NuCare does not dispute that it created and produced the spreadsheets in question, the court will assume, *arguendo*, they are admissions by a party-opponent. *Nationwide Mut. Ins. Co. v. Gretchen Courtney & Associates, Ltd.*, 2013 WL 3790912, at *3-4 (N.D. Ill. July 19, 2013.) However, the second level of hearsay—creation of the summary charts by Plaintiffs' attorney—is not excepted by Rule 1006. "Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves…the exhibit must *accurately* summarize those documents[.]" *U.S. v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013) (emphasis added). The proponent of the summary must show that the voluminous source materials are what the

proponent claims them to be and that the summary accurately summarizes the source materials. *Id.*, *citing U.S. v. Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006).

Here, Plaintiffs attached an affidavit to their statement of additional facts in which their counsel avers that "some of the spreadsheet documents that were obtained from the defendant are incorrect." (Pl. SOF Ex. 121 ¶ 4.) Therefore, "using [the spreadsheets] and our knowledge of the facts (via Plaintiffs [sic] knowledge or other documents) to the best of our ability we matched the hospitals with the correct liaison." (*Id.*) However, Plaintiffs' counsel failed to establish exactly how he matched the hospitals with the correct liaisons or which hospitals and liaisons, in particular, were corrected. Plaintiffs' counsel also does not reveal which "other documents" he used in order to make his corrections or the basis for Plaintiffs "knowledge of the facts" or which facts in particular he is referencing.

Plaintiffs' counsel also avers that "in some cases the hospital admissions were missing in [Pl. SOF] exhibit 122 and just listed as 0. In those cases we took the numbers from the original spreadsheets that are attached [to Pl. SOF] exhibit 123." (Pl. SOF Ex. 121 ¶ 5.) Plaintiffs' counsel further states that "where we found an inconsistency between the two sets of spreadsheets we tried to appropriately correct it." (*Id.*) Exhibits 122 and 123, attached to Plaintiffs' statement of additional facts, are nearly illegible. Moreover, Plaintiffs' counsel once again failed to establish which hospital admissions numbers from exhibit 122 were missing. He also failed to outline the inconsistencies that he allegedly found, and to explain adequately his basis for understanding which spreadsheet had the accurate information so as to allow him to "correct" the inconsistency.

For these reasons, the summary charts lack foundation, constitute inadmissible hearsay, and are not competent evidence. Therefore, the court cannot consider the charts created by

Plaintiffs' counsel. The spreadsheets produced by NuCare create a separate problem. While NuCare does not dispute Plaintiffs' contention that it created and produced the spreadsheets, NuCare is correct in arguing that Plaintiffs have failed to lay the proper foundation for their admission. The court is unaware of whether these spreadsheets were created in the normal course of business, if they were created for the purposes of this litigation, or who created them. But determining whether the proper foundation has been laid for these spreadsheets is an entirely futile exercise—Plaintiffs never even *cite* to NuCare's spreadsheets in their statement of additional facts. Even if the court were to consider Plaintiffs' charts or NuCare's spreadsheets, which it does not, the outcome would remain the same—Plaintiffs have failed to present any evidence from which a reasonable jury could find that NuCare discriminated against Plaintiffs based on their age.

## II.     FACTS

The court takes the following facts from the parties' Local Rule 56.1 Statements of Facts ("SOFs"), to the extent that they are supported by admissible evidence and relevant to the issues raised in the motion. While the charts created by Plaintiffs' counsel and the spreadsheets produced NuCare are inadmissible, some of the admissions numbers for individual employees are either agreed upon by the parties or are supported by competent evidence (i.e., an affidavit ). In those instances, the court will accept the admissions as true for the purposes of NuCare's motion. Where facts are disputed, the court can take no position as to which version of the disputed matter is correct. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

### A.  Background

NuCare is an Illinois corporation that provides consulting services to skilled nursing facilities. (Def. SOF ¶ 3.) NuCare employs "liaison" employees, who are responsible for

providing marketing and placement assistance to nursing facilities by referring and securing admissions of patients into these facilities from various area hospitals. (*Id.* ¶ 4.)

Keubler, who was born September 19, 1959, was employed by NuCare as a liaison from January 2013 until her termination on June 26, 2013. (Def. SOF ¶¶ 1, 5.) Jordan was born on October 25, 1954 and worked for NuCare as a liaison from approximately December 2012 until her termination on June 26, 2013. (*Id.* ¶¶ 2, 5.) Prior to working for NuCare, both Plaintiffs worked as liaisons for Lexington Health Care ("Lexington"). (*Id.* ¶ 7.)

Tim Fields ("Fields") previously worked for Lexington as Vice President of Business Development. (Def. SOF ¶ 8.) Fields was responsible for hiring Keubler as a liaison at Lexington. (*Id.*) Sometime in 2011, Fields left Lexington and accepted a position with Symphony Financial ("Symphony") and NuCare as Senior Vice President of Strategy and Development. (*Id.* ¶ 9.) Symphony and NuCare are sister companies that are a part of the Symphony Post Acute Care Network. (*Id.*) In that position, Fields was responsible for overseeing Symphony's and NuCare's marketing services, including the hiring and termination of the liaison employees who provide these services. (*Id.* ¶ 10.) In early 2012, Kuebler left Lexington and was hired by Fields as a liaison at Symphony. (*Id.* ¶ 13.) Fields made the decision to transfer Kuebler from Symphony to NuCare sometime in January 2013. (*Id.* ¶ 18.) Fields also made the decision to hire Jordan, based on a recommendation from Kuebler, at NuCare after she resigned from Lexington. (*Id.* ¶ 21.) Jordan was hired by Fields on or around December 26, 2012. (*Id.*)

During the relevant time period, David Hartman ("Hartman") was the President of Operations of NuCare. (Pl. SOF ¶ 4.) Fields reported directly to Hartman. (*Id.*) Although Fields was responsible for hiring and terminating liaisons, he typically made Hartman aware of

new hires and sometimes made him "aware that something may be wrong" with a liaison. (Pl. SOF ¶ 5; Def. Reply, Tab D (Hartman), 14:22-15:14.) Hartman's first, and perhaps only, meeting with Plaintiffs took place at the Imperial Nursing Home sometime in April 2013. (Pl. SOF ¶ 7.) Although Hartman has only a limited recollection of the meeting, he testified during his deposition that he remembers being "unimpressed" with Jordan because she was "expressing negativity" toward the administrator of the building. (*Id.* ¶ 8.)

Plaintiffs' direct supervisor at NuCare was Lorin Liberson ("Liberson"). (Def. SOF ¶ 11.) During the relevant time period, Liberson was the Regional Vice President of Business Development at NuCare. (*Id.*) Like Fields, Kuebler, and Jordan, Liberson was previously employed at Lexington as the Director of Business Development. (*Id.*) Liberson met Kuebler while working at Lexington and developed a positive impression of Kuebler. (*Id.*)

As liaisons at NuCare, Kuebler and Jordan were primarily responsible for placing hospital patients into nursing facilities, with the ultimate goal of maximizing patient admissions. (Def. SOF ¶ 22.) The job duties of Kuebler and Jordan differed in at least one respect. During her time at NuCare, Kuebler was responsible for placing patients from University of Illinois Chicago Hospital ("UIC") into a wide variety of nursing facilities. Conversely, Jordan was responsible for placing patients from three hospitals (Elmhurst, Loyola, and Gottlieb) into one nursing facility—Aria. (*Id.*)

## B. Employee Action Plans

According to NuCare, a liaison's ability to succeed depends on his or her business development and interpersonal skills, including the ability to build and maintain strong relationships with referral sources at the assigned hospitals, as well as with the administrators and staff at NuCare's nursing facility clients. (Def. SOF ¶ 23.) If a liaison is not performing to

the satisfaction of NuCare, he or she may be placed on an Employee Action Plan ("EAP"). An EAP typically sets forth, in writing, goals for the liaison to achieve over a certain time period. (*Id.* ¶ 25.) Admissions goals are typically based on historical numbers for the hospital and nursing facility assigned to the liaison who is put on an EAP. (Pl. SOF ¶ 13.) EAPs vary in length of time and in content, but the general goal is the same: to encourage improvement by the liaison. (Def. SOF ¶ 25.) Depending on the progress of the individual on an EAP, an EAP may be extended or may be cut short. (*Id.*) Although there is no written policy regarding when a liaison should be put on an EAP, both Liberson and Fields testified that an EAP presents a "last opportunity" for a liaison to improve his or her performance. (*Id.* ¶ 24.) Failure to improve performance, once put on an EAP, can result in termination. (*Id.*)

## C. Plaintiffs' Performance Issues

### i. Barbara Kuebler

After the first few months of Kuebler's employment at NuCare, Liberson became concerned that Kuebler's admission numbers from UIC were low, especially when compared to the admissions numbers from the same hospital during the same months in 2012. (Def. SOF ¶ 27.) Based on a spreadsheet filed under seal by NuCare,[3] Kuebler's admission numbers for January, February, March, and April of 2013 were 7, 11, 7, and 9, respectively, for a total of 34 admissions. (Dkt. 87.) For the same months in 2012, the admission numbers were 10, 17, 14, and 4 for a total of 45 admissions. (Dkt. 87.) Liberson was especially concerned about Kuebler's performance since UIC was previously assigned to a liaison who was also responsible for placing patients from an additional hospital: Anne Ribordy was responsible for placing

---

[3] The spreadsheets filed under seal (Dkt. 87) were authenticated by Lesa Jegusch, Executive Assistant at NuCare. (Def. Resp. to Pl. SOF, Ex. J, Dkt. 74.)

patients from both UIC and Rush University Medical Center ("Rush Chicago") in 2012. (Pl. SOF ¶ 20.)

Because of her low admissions numbers, Kuebler was placed on an EAP by Liberson. Kuebler and Liberson met to discuss and review Kuebler's EAP in person on or about April 26, 2013, and Kuebler was provided with a written copy of the EAP. (Def. SOF ¶ 28.) The EAP, dated April 24, 2013, laid out the improvement goals for Kuebler for the next thirty days. Among other things, Kuebler was expected to do the following: secure 15 new admissions from UIC; provide weekly status reports to Liberson about patient referrals; and create effective marketing opportunities with medical doctors and referring social workers at UIC to help increase admissions from the hospital. (*Id.* ¶ 30.)

On May 22, 2013, 26 days after the EAP meeting between Kuebler and Liberson, Kuebler sent Liberson an email listing her admissions totals from the beginning of the EAP. According to Kuebler, there were 13 admissions with 2 pending, which she asserted would satisfy the 15 admission goal in her EAP. (Pl. SOF ¶ 18.) However, according to unrebutted testimony from Fields, 2 of the 13 admissions listed by Kuebler were actually re-admissions and are not counted as "admissions." (Def. SOF Tab C (Fields), 159:22 – 160:6.) It is also unknown whether the two "pending" admissions were actually admitted. Nevertheless, even if the pending admissions were actually admitted after May 22 and before the EAP deadline of May 26, Kuebler still fell short of the goal outlined in the EAP because of the two re-admissions.

Although her EAP formally ended on May 26, Kuebler continued to send tracking forms to Liberson and Fields to update them on her admissions progress. (Def. SOF ¶ 34.) In an email dated June 5, 2013, Kuebler sent a tracking form, covering the dates between May 30 and June 5, which reflected two admissions for that week. (*Id.*) Kuebler submitted her next tracking form

on June 13, 2013, covering the period of June 6 to June 12, which reflected that she obtained two more admissions.  (*Id.*)  Finally, Kuebler emailed Liberson a tracking form on June 19, 2013 reflecting zero admissions from June 13 to June 19.  (*Id.*)  Kuebler admitted a total of 8 patients from UIC throughout the month of June up to her termination.  (Dkt. 86.)

Fields sent an email to NuCare's Vice President of Human Resources and Employee Enrichment ("Human Resources"), Carly Saltis ("Saltis"), on May 5, 2013 advising her that NuCare would "most likely need to proceed with a performance based termination of Barb Kuebler.  She is on a 30 day [sic] plan."  (Pl. SOF ¶ 15.) When asked by Saltis whether Kuebler would have the full 30 days to improve, Fields responded by stating that they were not terminating Kuebler yet, but "just preparing for the inevitable."  (*Id.*)  Liberson and Hartman were copied on the emails between Saltis and Fields.

Sometime in June, Fields made the decision to terminate Kuebler.  On June 26, 2013, Fields and Saltis met with Kuebler to inform her of Fields' decision to terminate her employment.  (Def. SOF ¶ 37.)  There is disagreement between the parties regarding whether Fields made it known to Kuebler that she was being terminated because of her performance. However, on July 3, 2013, Saltis sent a letter to Kuebler confirming that her termination was based on her poor performance.  (Def. SOF ¶ 40, Tab M (Saltis), Ex. 14.)

During her time at NuCare, Kuebler never expressed any concerns nor voiced any complaints to Fields, Saltis, Liberson, or any other NuCare manager regarding mistreatment or discrimination based on her age.  (Def. SOF ¶ 38, Tab A (Kuebler), 148:2-10.)

### ii.    Jeannette Jordan

While she was employed at NuCare, Jordan was primarily responsible for placing patients from Elmhurst, Loyola, and Gottlieb hospitals into the Aria nursing facility.  (Def. SOF

¶ 42.) Aria's Administrator, and Jordan's point of contact for that facility, was Mo Polstein

("Polstein"). Polstein complained to Carly Saltis with Human Resources about Jordan's work

performance. (Def. SOF ¶ 46, Tab G (Saltis) 40:10-41:6.) Specifically, Polstein avers that he

repeatedly observed that Jordan was "not a team player, was combative and negative in how she

communicated Aria-related concerns, and generally failed to market Aria in a positive manner."

(Def. SOF ¶ 46, Tab N (Polstein Declaration) ¶ 4.) Polstein told Jordan directly that "she should

really try to stick up more for the building (Aria)." (Def. SOF ¶ 46, Tab C (Jordan), 126:9-12.)

Jordan responded to Polstein by stating that her "hands [were] tied when [she] can't stick up for

a building (Aria) when it's in disarray and when the patient calls me at 2:30 in the morning that

they are unhappy." (Def. SOF, Tab B (Jordan), 126:13-16.)

On or around May 5, 2013, Liberson met with Jordan and placed her on a 30-day EAP.

(Def. SOF ¶¶ 48-49.) During their meeting, Liberson provided Jordan with a copy of her EAP

and reviewed with her its contents and components. (*Id.* ¶ 49.) One of the goals set for Jordan

was 17 admissions into Aria from her assigned hospitals (Elmhurst: 4; Loyola: 5; Gottleib: 8) in

that 30-day period. (*Id.* ¶ 50.) In addition to setting quantitative goals for Jordan, Liberson

emphasized that Jordan should "work on being part of the NuCare team." (*Id.* ¶ 51.) Jordan

admitted that the goal of working to be "part of the NuCare team" stemmed from a prior incident

where Jordan was engaged in a confrontation and "exchanged words" with NuCare's Director of

Nursing. (Def. SOF, Tab H (Jordan), 117:13-120.) Jordan later apologized for her actions and

for her role in the confrontation. (*Id.*) Finally, Liberson stressed to Jordan the importance of

timely submitting new admissions paperwork to the nursing facility as well as being

"communicative in that regard with the facility's staff." (Def. SOF ¶ 51.)

At the end of the 30-day period, Jordan had failed to meet the goals set out in her EAP. Jordan secured only 14 admissions into Aria from her three referring hospitals in the month of May, 3 admissions short of her goal of 17. (Def. SOF ¶ 53.) Jordan and Liberson met on June 11, 2013 to discuss Jordan's performance. (*Id.*) During the meeting, Liberson told Jordan that she needed to continue to improve her admission numbers at Aria, especially with respect to admissions from Elmhurst hospital, where Jordan secured only 1 admission in all of May. (*Id.*)

According to NuCare, Jordan's performance did not improve after the June 11, 2013 meeting, either in terms of admissions or efforts to promote Aria. As a result, Jordan was terminated on June 26, 2013. (Def. SOF ¶ 54.) Fields told Jordan during the June 26 meeting that she was being terminated because "things [were] just not working out with [her] working as a liaison for Aria," and Fields was disappointed with her admissions numbers. (*Id.* ¶ 55.) Like Kuebler, Jordan never expressed any concerns nor voiced any complaints to Fields, Saltis, Liberson, or any other NuCare manager regarding mistreatment or discrimination based on her age prior to her termination. (Def. SOF ¶ 56, Tab B (Jordan), 159:19-160:22.)

## III.    ANALYSIS

The ADEA prohibits an employer from discharging an individual because of her age. U.S.C. § 623(a)(1). "To establish a claim under the ADEA, a plaintiff-employee must show that 'the protected trait (under the ADEA, age) actually motivated the employer's decision'—that is, the employee's protected trait must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'" *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (quotations omitted). To defeat a motion for summary judgment in a discrimination case, a plaintiff must either present direct evidence that her discharge was the result of discrimination, or use the indirect "burden-shifting"

approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d

668 (1973); *Hemsworth*, 476 F.3d at 490-91; *Flores v. Preferred Tech. Group*, 182 F.3d 512, 514

(7th Cir. 1999).  Here, Plaintiffs note that the trend is for courts to merge the direct and indirect

method into a single standard.  This court has previously noted the same.  *Gross v. Radioshack*

*Corp.*, 2007 WL 917387, at *9, n.15 (N.D. Ill. Mar. 26, 2007).  Although there is overlap

between the two different methods, the court will address each in turn.  Additionally, Plaintiffs'

arguments will be considered together as that is how they have been presented to the court.

**A.      Direct Method**

Under the direct method, "the plaintiff must present either direct or circumstantial

evidence of discrimination in her opposition to summary judgment." *Hutt v. AbbVie Products*

*LLC*, 757 F.3d 687, 691 (7th Cir. 2014), *quoting Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d

835, 840 (7th Cir. 2014).  Whether direct or circumstantial, the "evidence [must] permit the trier

of fact to find that unlawful discrimination caused the adverse job action." *Bass*, 746 F.3d at 840.

"Direct evidence requires an admission of discriminatory intent, i.e. 'smoking gun' evidence."

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (internal quotation marks

and citations omitted). "Circumstantial evidence," by contrast, "typically includes (1) suspicious

timing; (2) ambiguous oral or written statements, or behavior toward or comments directed at

other employees in the protected group; (3) evidence, statistical or otherwise, that similarly-

situated employees outside the protected class received systematically better treatment; and (4)

evidence that the employer offered a pretextual reason for an adverse action." *Hobgood v.*

*Illinois Gaming Bd.*, 731 F.3d 635, 643-46 (7th Cir. 2013).  "A party may combine these various

types of evidence to present a convincing mosaic of circumstantial evidence from which a

factfinder can make a reasonable inference of discriminatory intent." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (internal quotation marks omitted).

Plaintiffs have failed to present a "convincing mosaic" because none of the elements listed above are present. First, Plaintiffs argue that Hartman's first meeting with Plaintiffs, where he later testified that he was "unimpressed" with Jordan's demeanor, was followed shortly by Plaintiffs being placed on their respective EAPs, thereby establishing "suspicious timing." That argument is unavailing. There is no evidence whatsoever that Hartman was involved in placing Plaintiffs on an EAP or in the decision to terminate Plaintiffs. Plaintiffs attempt to create an inference that Hartman may have been involved in the decision to terminate Plaintiffs by the mere fact that he was carbon copied on a number of emails leading up to their termination. However, it is undisputed that the decision to terminate Plaintiffs was made by Fields. Plaintiffs admit as much in their statement of additional facts.

Plaintiffs have also not presented any evidence of any ambiguous oral or written statements directed at other employees in the protected class. Similarly, Plaintiffs have failed to present any evidence, statistical or otherwise, that similarly-situated employees outside the protected class received systematically better treatment. As noted earlier, the "statistical information" provided by Plaintiffs in the form of charts and spreadsheets lack foundation and are not competent evidence. However, as more fully explained below, even if the court were to consider the charts and spreadsheets offered by Plaintiffs, there is no evidence as to which, if any, employees outside the protected class are similarly situated as to Plaintiffs. Finally, NuCare has offered a legitimate non-discriminatory reason for its decision to terminate Plaintiffs, and nothing in Plaintiffs' evidence suggests that NuCare's stated reason—poor performance—is unworthy of belief. Thus, Plaintiffs have failed to prove discrimination under the direct method.

**B.      Indirect Method**

Under the indirect "burden-shifting" approach of *McDonnell Douglas*, 411 U.S. at 802, Plaintiffs must first establish a *prima facie* case of discrimination. Assuming Plaintiffs can make out a *prima facie* case, NuCare must then articulate a legitimate, non-discriminatory reason for their discharge.  Plaintiffs are then obliged to establish that the reason articulated is pretextual. *Luks v. Baxter Health*, 467 F.3d 1049, (7th Cir. 2006).

To establish a *prima facie* case, Plaintiffs must show that: (1) they are members of a protected class; (2) they were meeting their employer's legitimate expectations; (3) they suffered an adverse employee action; and (4) similarly situated employees outside of the protected class received more favorable treatment. *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 477 (7th Cir. 2010).  Assuming that Plaintiffs can successfully lay out a *prima facie* case, the burden then shifts to NuCare to provide a legitimate, non-discriminatory reason for its decision to terminate their employment. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008).  If NuCare meets this threshold, Plaintiffs may attack NuCare's proffered reason as mere pretext for discrimination. *Id.*

There is no dispute that Plaintiffs are members of the protected age class: Kuebler and Jordan were 53 and 58 years old, respectively, at the time of their termination.  It is also uncontested that Plaintiffs suffered an adverse employee action when they were terminated. Therefore, Plaintiffs must establish that they were meeting NuCare's legitimate expectations at the time that they were terminated and that similarly situated employees outside the protected class received more favorable treatment.  Because Plaintiffs are claiming that NuCare's legitimate expectations were disparately applied, the second and fourth elements of the *prima*

*facie* case are closely intertwined with the pretext analysis, and the two inquiries may be merged and considered together. *Faas*, 532 F.3d at 642.

"Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000)); *see also Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir.2004) ("Pretext is more than a mistake on the part of the employer; it is a phony excuse."). "Showing pretext requires '[p]roof that the defendant's explanation is unworthy of credence.'" *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1063 (7th Cir. 2008) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)). To show that NuCare's explanations are not credible, Plaintiffs must point to evidence that they are not the real reasons it fired them, have no grounding in fact, or are insufficient to warrant the termination decision. *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008). At the end of the day, the question is simply whether "the same events would have transpired" if Plaintiffs "had been younger than 40 and everything else had been the same." *See Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994) (citations omitted).

NuCare explained that it terminated Plaintiffs because of their poor performance and failure to improve after being placed on their respective EAPs. It is undisputed that, after a period of approximately four months, Plaintiffs were placed on an EAP in an effort to improve their performance. As to Kuebler, the evidence demonstrates that during the first four months of her employment, she secured 34 admissions from UIC, while her predecessor, Ribordy, secured 45 admissions from UIC during the same four months in 2012 as a part-time liaison.[4] Kuebler also has not put forward any competent evidence to rebut NuCare's argument that Kuebler failed to meet her goal of 15 admissions once she was placed on the 30-day EAP. Although she

_____
[4] "Part-time," in this case means that Ribordy was responsible both UIC and Rush Chicago.

showed some improvement, it was not enough to meet NuCare's required total. Similarly, NuCare has put forth evidence that it was not satisfied with Jordan's performance, specifically, its discontent with Jordan's poor attitude, as observed by her superiors, and her unwillingness or inability to "sell" the Aria facility. After being placed on a 30-day EAP, Jordan admitted that she did not achieve the goals set out for her.

Plaintiffs argue that NuCare is lying when it claims that they were terminated for their poor performance because NuCare disparately applied its performance expectations when younger liaisons with similar performance problems were either not placed on an EAP or were placed on an EAP and but not terminated. However, as noted, Plaintiffs have not offered any competent evidence from which the court can assess whether younger liaisons underperformed relative to the historical numbers for their assigned hospitals or nursing facilities. Even if the court accepted Plaintiffs' assertion that NuCare did not subject its younger liaisons to the same standards imposed upon Plaintiffs, NuCare argues that the liaisons referenced by Plaintiffs were not "similarly situated." to Plaintiffs.

For the fourth prong of the *McDonell Douglas* test, Plaintiffs must show that members of the comparative group are "directly comparable to her in all material respects." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (internal quotation marks and citation omitted) (noting that relevant factors include "whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience and qualification"). Keeping in mind that this prong ought not be applied in an "unduly rigid" or "narrow[ ]" manner, Plaintiffs have not put forth evidence that the liaisons listed had a comparable education, comparable experience, or comparable qualifications. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845–46 (7th Cir. 2007)

(noting that the plaintiff must show that "members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment").  Plaintiffs offer the court nothing more than the liaisons' ages and admissions numbers as compared to the admissions numbers one year prior.  However, as noted, NuCare expected a better performance from Kuebler, given her experience as a liaison prior to joining NuCare.  The court is unaware of the experience, education level, or background of the liaisons cited for comparison.  The court is also unaware whether those liaisons were supervised by Liberson.  Given the fact that it was the responsibility of each liaison's supervisor to determine if and when an EAP would be appropriate, this piece of information is necessary when making comparisons.  Plaintiffs' naked assertion that every liaison had the same job duties falls short of carrying it burden to demonstrate that the proffered liaisons are "similarly situated" to Plaintiffs.   As a result, Plaintiffs have failed to establish the fourth prong of the *McDonnell Doughlas* test.

Even if the court finds that Plaintiffs have established a *prima facie* case of discrimination, Plaintiffs have not shown that NuCare's reasons for their termination were pretextual.  NuCare has satisfied its burden to articulate a legitimate, nondiscriminatory explanation for its decision to terminate Plaintiffs.  *Reeves*, 530 U.S. at 142.  Namely, NuCare states that it terminated Plaintiffs because of their poor performance.  The burden shifts to Plaintiffs to prove, by a preponderance of the evidence, that such reasons were mere pretext for age discrimination.  Plaintiffs' argument for pretext is the "grossly inflated" admissions figures in Plaintiffs' EAPs.  However, the legitimacy and reasonableness of expectations should be left to the employer since "it is no business of a court in a discrimination case to decide whether the employer demands too much of its workers."  *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1998).  But even if the court were to engage in such an exercise, a review of the

spreadsheets attached to an affidavit from Lesa Jagusch, Executive Assistant at NuCare, reveals that 15 admissions from UIC (Kuebler) and 17 admissions from three hospitals into Aria (Jordan) is not grossly inflated.[5]  Plaintiffs have therefore failed to demonstrate pretext on the part of NuCare.

## IV.  CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [45] is granted.


Date:  March 14, 2015                                    _____/s/_____

                                                        Joan B. Gottschall
                                                        United States District Judge

---

[5] There were 17 admissions from UIC in February 2012.  (Dkt. 86.)  There were 18 admissions and 17 admissions in May and June 2014, respectively, into Aria.  (*Id.*)